Michelle GIBSON, Plaintiff–Appellant,

v.

COUNTY OF WASHOE, NEVADA; Richard Kirkland, Washoe Co. Sheriff; Ray Wright, Washoe Co. Chief Deputy Sheriff; John Williams, Washoe Co. Supervising Sgt.; Rob Bowlin; Jereme Wormington; Michele Youngs; Scott Thomas; Robert Cook; Mary Jean Cloud, individually and in their capacities as deputy sheriffs of Washoe Co., Defendants–Appellees.

No. 99–17338.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 2001.

Filed May 22, 2002.

1176

Jerry H. Mowbray, Reno, Nevada, for the appellant.

Gregory R. Shannon, Washoe County District Attorney's Office, Reno, Nevada, for the appellees.

Before: REINHARDT, TASHIMA and BERZON, Circuit Judges.

BERZON, Circuit Judge.

On February 3, 1996, Stephen Gibson suffered a heart attack and died while in the custody of the Washoe County, Nevada, Sheriff's Department. Gibson's wife Michelle ("Ms.Gibson") brought this lawsuit under 42 U.S.C. § 1983, on behalf of herself, their two children, and Gibson's estate, against the County, the sheriff, and a number of the sheriff's deputies who were on duty at the Washoe County jail the night Gibson died. Ms. Gibson con-

tended in the district court that the County and the individual defendants violated Gibson's substantive due process rights by the manner in which they treated him on the night he died. She now appeals from the district court's grant of summary judgment for the defendants. We affirm with regard to the individual officers and, in part, with regard to the County. We conclude, however, that summary judgment was improperly granted on the question whether the County was deliberately indifferent to Gibson's mental illness while he was in custody at the county jail.

Because this appeal follows a grant of summary judgment for the defendants, review is de novo. To determine whether there is a genuine issue of material fact, we take into account all the reasonable inferences that favor the non-moving party. *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061(9th Cir.2002).

## I. Background

### A. *Gibson's Death*

#### 1. *The "Attempts To Locate"*

Stephen Gibson suffered from manic depressive disorder. He had been hospitalized several times for the disorder from 1991 until his death in 1996, and was in the regular care of a psychiatrist, Dr. Tannenbaum, at the time of his death. Dr. Tannenbaum prescribed medications to help Gibson control his illness.

In late January, 1996, Gibson was entering a manic phase. Early on the morning of Wednesday, January 31, he was pacing agitatedly through his home, pointing his gun at the walls and twirling a large knife in his hands. Gibson then packed his clothes and left the house, refusing to tell Ms. Gibson where he was going. When she suggested that he take one of the sedatives that he often used during his manic phases, he told her to shut up and said that he would "take her up to the

mountains." Interpreting this statement as a threat to her safety, Ms. Gibson packed her things, gathered the children, and went to her in-laws' home. Ms. Gibson also contacted West Hills Hospital to make arrangements for Gibson's admission.

Over the next two days, Ms. Gibson called the police several times—once in the company of Dr. Rich, the psychiatrist on call at West Hills—in an effort to find Gibson and have him taken to the hospital. Four dispatches were broadcast over the Reno[1] and Washoe County police frequencies:

On February 1 at 9:33 PM, a notice was broadcast, providing Gibson's name and description and describing him as missing and endangered. The broadcast stated that Gibson was "a manic depressive on several medications, [reported] to have a loaded 10–32 with him and does not like police officers."

On February 2 at 3:58 PM, an "attempt to locate" ("ATL") dispatch was broadcast, stating that Gibson was manic depressive, had threatened to kill his wife, and might be armed with a gun or knives.

At 5:15 PM that same day, another ATL was broadcast, describing Gibson and stating that, in accord with the directions of his doctor, Dr. Rich, he should be brought to West Hills Hospital for emergency commitment. This ATL was rebroadcast at 10:39 PM.

### 2. The Arrest

Just after 3:00 AM on February 3, Washoe County deputies Anthony Miranda and Richard Hodges encountered Gibson outside a convenience store. Gibson left his truck running with the lights on and the driver's door open while he went into the store. Miranda followed him inside. Gibson bought a beer, a cup of coffee, and

a pack of cigarettes, and as he paid for them, flung his change across the counter past the cashier. Miranda thought Gibson might be drunk, but smelled no alcohol on him.

Gibson left the store and continued to behave strangely. He wandered around the parking lot near his truck for about 20 minutes and returned to the store several times. Gibson eventually got into the truck, which did not have license plates, and drove away. The deputies, who believed that Gibson was possibly driving under the influence of alcohol or drugs, observed Gibson attempt to turn out of the parking lot, then back up and try the turn again, this time successfully. Gibson then drove out of the deputies' sight. The deputies left the parking lot and caught up with Gibson, in time to observe him drive straight through an intersection from a left-turn lane. The deputies then radioed dispatch that they were stopping a possible DUI driver and pulled Gibson over. Although Gibson promptly stopped, he refused to turn off the ignition or to leave the truck when the deputies requested him to do so.

Because Gibson refused to get out of the truck, Hodges opened the driver's door, grabbed Gibson's arm, and pulled him from the truck. Although he was shouting obscenities and yelling that the police were going to plant something in his truck, Gibson then became physically cooperative, stepping toward the patrol car with his hands on his head as directed.

Hodges administered a field sobriety test. Gibson was adamant that he had not been drinking, but agreed to the test, peppering the officers with obscenities all the while. Gibson's behavior made administration of the test difficult. Finally, after Gibson told Hodges to "shut the fuck up,"

---

**1.** Washoe County contracted with the City of Reno for its police dispatch services.

the deputies had enough, and placed Gibson under arrest.

Miranda and Hodges had not heard the ATL about Gibson when it was broadcast earlier that evening. During the course of the arrest, the deputies called in to their dispatcher to check Gibson's name and the truck's registration against various crime databases. Although the dispatcher performed these checks and reported back to the deputies, the dispatcher did not notify the deputies that Gibson was the subject of an outstanding ATL directing that Gibson be taken to West Hills for emergency commitment.

When Hodges searched Gibson's truck after the arrest, he located several prescription medication containers with Gibson's name on the label. Although he did not recognize the names of the drugs, Hodges suspected that they were "psych meds," and that Gibson might not be taking his medication.

During the arrest, Gibson was physically cooperative with the deputies as they handcuffed him, but continued to swear at them. After the deputies put Gibson in the patrol car and headed for the Washoe County jail, however, Gibson became physically combative, kicking the partition between the car's front and back seats. The deputies called ahead to the jail to notify the officers there that they were bringing in a combative suspect.

### 3. The Jail

When Deputies Miranda and Hodges arrived at the Washoe County Jail with Gibson, he refused to get out of the patrol car. Four deputies pulled Gibson from the car and carried him into the jail's sally port, the vestibule to the jail's booking area where incoming arrestees are searched. There, they placed Gibson face down on the floor. As the officers searched Gibson, he repeatedly called out, "Help me, Jesus." The officers restrained Gibson with a waist chain, wrist chains, and leg irons, and dragged him through the booking area. After Gibson was photographed and booked, the officers placed him, alone, in a holding cell.

Meanwhile, Hodges and Miranda completed their paperwork, and, consistently with County policy, delivered the drug containers Hodges found in Gibson's truck to the nurse on duty. The nurse confirmed to Deputy Miranda that the medications were to stabilize somebody who was suffering from mental illness. As far as the record shows, however, no one else on duty at the jail that night was told about the likelihood that Gibson suffered from a mental illness, and, aside from conclusions that could be drawn from Gibson's behavior, no one else had reason to suspect that Gibson so suffered.

Twice during the night, Gibson slipped out of his waist chain. The first time, the deputies on duty entered Gibson's cell and replaced the chain with little difficulty. Later, around 6:00 in the morning, Gibson slipped out of the chain again, and banged it repeatedly against the window in his cell door. This time, Sgt. John Williams, who was in charge that night, decided that Gibson should be further restrained. As several deputies readied to enter the holding cell, Gibson assumed a fighting stance with his fists up and shouted obscenities at them.

Because Gibson was so difficult to control, Williams then gave the order to transfer him to a special watch cell containing a bench with attached soft restraints and a helmet. Williams opened the cell door as Deputy Robert Bowlin quickly sprayed Gibson in the face with pepper spray. The officers shut the cell door as Gibson fell to his knees, screaming that the spray was burning him. Deputies Bowlin, Scott Thomas, and Robert Cook entered the holding cell and grabbed Gibson; the three

officers held Gibson down, while more deputies came to help take Gibson from the holding cell.

Several deputies dragged Gibson into the special watch cell and shifted him up onto the bench. As Gibson lay face down on the bench, Deputies Michelle Youngs and Mary Jean Cloud climbed onto his back and legs, while the other deputies helped restrain his arms and legs. Gibson continued to struggle. In Deputy Jeremy Wormington's words,

> We put him on his stomach. And he was still at this point kicking and screaming and fighting and everything and yelling at us and he was, for being pepper sprayed twice ... this guy had an incredible amount of fight in him. I mean just huge amount of fight 'cause here were are, at this time, I don't remember how many deputies were on him, but I was trying to control his head, his left shoulder blade, his left forearm, and I remember Deputy Cloud was right to my right on his back and he like jumped, I mean lifted himself off the bed ... I mean, this guy was fighting. And all of a sudden for some reason I looked at his head and I looked at Cloud and we looked down and Cloud's like, "Get a pulse."

An on-site paramedic and several of the deputies immediately administered CPR. Several minutes later, a team of paramedics arrived and took Gibson to St. Mary's Hospital, but Gibson never revived.

According to an autopsy report, the immediate cause of Gibson's death was severe arteriosclerosis, a disease of which neither he nor Ms. Gibson had been aware. The defendants' medical expert testified that the "entire milieu" of Gibson's uncon-

trolled manic state and the officers' efforts to restrain him "resulted in a physiologically stressful state for Mr. Gibson, which essentially resulted in a heart attack."

### B. *The County's Policies*

Washoe County has numerous detailed, written policies and procedures concerning the intake of detainees at the jail. Most pertinent here are those policies and procedures relating to the medical evaluation of incoming detainees. (Other policies are described later in this opinion.)

First, upon bringing an arrestee into the sally port, a deputy must "visually assess the prisoner ... for any obvious signs of sickness or injury requiring medical attention." The jail's nursing staff also evaluates "all inmates, upon arrival ..., for any obvious signs of sickness or injury requiring immediate medical attention."[2] The medical screening process to be conducted by a medical staff member consists of several steps: a visual assessment of the inmate, filling out a medical questionnaire, completion of a suicide prevention screening form, and completion of a treatment consent form. If the jail is unable to provide the medical care that a prisoner needs, the medical staff may reject the prisoner, and the prisoner will be taken to a hospital. However, this "Medical Screening process will be delayed if the inmate is combative, uncooperative or unable to effectively answer questions due to intoxication."

Second, "[i]f the prisoner has prescription medication, the intake nurse will be requested to evaluate the medication and make a determination whether the medication is placed in secured property or in the Infirmary for follow up care."

---

**2.** The County's procedures regarding when the jail's medical staff should evaluate incoming detainees appear somewhat to contradict one another. One procedure states that the nursing staff will be requested to make an

evaluation "[i]f the prisoner has visible or claimed injuries." Another procedure states that a medical staff member "will check *all* inmates, upon arrival to the facility." (emphasis added).

In addition, County policy requires that the jail's medical unit be staffed twenty-four hours a day by licensed medical personnel. The medical staff has sole responsibility for determining if "the prisoner is accepted or refused into the facility due to medical reasons." Until 1995, the County also had employed, through the state's institution for the criminally insane, a full-time clinical mental health worker at the jail to perform mental health screenings of inmates. From 1995 until 1999, however, there was no mental health worker at the county jail to perform this function, because of a soured relationship between the jail's medical staff and the mental hospital. At the time that Gibson died in the County's custody, consequently, the County did not screen detainees at the jail. The mental health evaluation service resumed in 1999 after, in Sheriff Kirkland's words, the sheriff's department "patch[ed] up those bad feelings."

## II. This Litigation

Ms. Gibson, on behalf of herself, her husband's estate, and her children, filed a complaint under 42 U.S.C. § 1983 against Washoe County, and, in their official and individual capacities, the county sheriff, the chief deputy sheriff, a supervising sergeant, and several deputies who were on duty at the jail the night that Gibson died.[3] She alleged three causes of action: (1) that the individual deputies used excessive force on Gibson in violation of his due process rights; (2) that the individual deputies showed deliberate indifference to Gibson's serious mental health condition in violation of his substantive due process rights; (3) that the individual deputies' actions resulted from policies, practices or customs of the Washoe County sheriff's department, and these policies, practices or customs caused and/or contributed to Gibson's death, in violation of his due process rights.[4]

In addition to the County policies described above, Ms. Gibson asserted that several other policies contributed to Gibson's death. She contended that the lack of a system for communicating outstanding ATL's from one shift to another, and from deputies on patrol to deputies or medical staff at the jail, revealed deliberate indifference to the constitutional rights of the mentally ill. Ms. Gibson also argued that the County failed adequately to train its deputies in recognizing and handling mentally ill individuals whom they encountered in the course of their duties.

The district court referred the disposition of the defendants' motion for summary judgment to a magistrate judge, who recommended granting the motion as to all of Ms. Gibson's claims. First, the magistrate judge determined that the inadequacies in communicating ATL's could not give rise to a constitutional violation because the county lacks any duty to provide competent emergency services to the general public, citing *DeShaney v. Winnebago County Dept. of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Second, citing *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the magistrate judge concluded that Ms. Gibson's allegations that the County failed adequately to train its sheriff's deputies in recognizing and dealing with mentally ill individuals lacked merit.

---

3. Deputies Miranda and Hodges, who arrested Gibson, were not named as defendants, nor was the nurse on duty.

4. Ms. Gibson also alleged a § 1983 cause of action for deprivation of her liberty interest in her husband's consortium, and two state-law

negligence claims. The district court granted the defendants' motion for summary judgment on the consortium claim and declined to exercise supplemental jurisdiction over the state-law claims. *See 28 U.S.C.* § 1367(c). Ms. Gibson has not appealed these rulings.

<br>

There was no evidence of a pattern of constitutional violations resulting from failure to recognize detainees' mental illnesses, the magistrate judge concluded, nor was the need to train deputies in recognizing and dealing with mentally ill individuals "so obvious" that the failure to do so was likely to result in constitutional violations. Third, characterizing Gibson's serious health condition not as his mental illness but as his severe heart disease, the magistrate concluded that the individual defendants did not show deliberate indifference to his health. Finally, the magistrate judge rejected the contention that the individual defendants had used excessive force in moving Gibson from his holding cell and restraining him in the special watch cell.

After considering and rejecting Ms. Gibson's objections to the magistrate's report and recommendation, the district court granted the defendants' motion for summary judgment. Ms. Gibson appeals.

### III. Analysis

#### I. County Liability

A municipality may be held liable under a claim brought under § 1983 only when the municipality inflicts an injury, and it may not be held liable under a respondeat superior theory. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

#### A. Two Paths to County Liability

At least two routes can lead to the conclusion that a municipality has inflicted a constitutional injury. First, a plaintiff can show that a municipality itself violated someone's rights or that it directed its employee to do so. *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1994). Alternatively, in limited situations, a plaintiff can demonstrate that a municipality is responsible for a constitutional tort committed by its employee, even though it did not direct the employee to commit the tort. *Id.*, at 406–07, 117 S.Ct. 1382; *Canton*, 489 U.S. at 387, 109 S.Ct. 1197.

Under one route to liability, a municipality may be liable under § 1983, just as natural persons are, because when Congress enacted § 1983 it "intend[ed] municipalities and other local government units to be included among those persons to whom § 1983 applies." [5] *Monell*, 436 U.S. at 689, 98 S.Ct. 2018. To show that the municipality violated someone's rights or instructed its employees to do so, a plaintiff can prove that the municipality acted with "the state of mind required to prove the underlying violation," just as a plaintiff does when he or she alleges that a natural person has violated his federal rights. *Board of County Comm'rs*, 520 U.S. at 405, 117 S.Ct. 1382. Examples of this direct path to municipal liability include: a city's policy of discriminating against pregnant women in violation of the Fourteenth Amendment, *Monell*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611; a policy-maker's order to its employees to serve capiases [6] in violation of the Fourth Amendment, *Pembaur v. City of Cincin-*

5. Section 1983 states in part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

6. "A capias is a writ of attachment commanding a county official to bring a subpoenaed witness who has failed to appear before the court to testify and to answer for civil contempt." 475 U.S. at 472 n. 1, 106 S.Ct. 1292.

*nati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); and a county policy that policymakers know will place aggressive and passive homosexuals in the same jail cell in violation of the passive homosexual's Fourteenth Amendment right to personal security. *Redman v. County of San Diego*, 942 F.2d 1435 (9th Cir.1991) (en banc).[7]

▆ Under a second route to municipality liability, a plaintiff need not allege that the municipality itself violated someone's constitutional rights or directed one of its employees to do so. Instead, a plaintiff can allege that through its *omissions* the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation. *Canton*, 489 U.S. at 387–89, 109 S.Ct. 1197. However, because *Monell* held that a municipality may not be held liable under a theory of respondeat superior, a plaintiff must show that the municipality's deliberate indifference led to its omission and that the omission caused the employee to commit the constitutional violation. *Id.* at 387, 109 S.Ct. 1197. To prove deliberate indifference, the plaintiff must show that the municipality was on actual or constructive notice that its omission would likely result in a constitutional violation. *Farmer v. Brennan*, 511 U.S. 825, 841, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Compared to the more direct route to municipal liability discussed above, "much more difficult problems of proof" are presented in a case where a city employee acting under a constitutionally valid policy violated someone's rights. *Board of County Comm'rs*, 520 U.S. at 406, 117 S.Ct. 1382.

As the record now stands in the case currently before the court, Ms. Gibson may be able to demonstrate municipal lia-

---

7. The municipal defendants (the County and its policy-makers, Sheriff Kirkland and Chief Deputy Sheriff Wright) assert that if we conclude, as we do, *see infra*, that the individual deputy defendants are not liable for violating Gibson's constitutional rights, then they are correspondingly absolved of liability. Although there are certainly circumstances in which this proposition is correct, *see City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) and *Quintanilla v. City of Downey*, 84 F.3d 353, 355 (9th Cir.1996), it has been rejected as an inflexible requirement by both this court and the Supreme Court.

For example, a municipality may be liable if an individual officer is exonerated on the basis of the defense of qualified immunity, because even if an officer is entitled to immunity a constitutional violation might still have occurred. *See, e.g., Chew v. Gates*, 27 F.3d 1432, 1438–39 (9th Cir.1994). Or a municipality may be liable even if liability cannot be ascribed to a single individual officer. *Owen v. City of Independence*, 445 U.S. 622, 652, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (a "'systemic' injury" may "result not so much

from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith.") (citation omitted). And in *Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002), we explicitly rejected a municipality's argument that it could not be held liable as a matter of law because the jury had determined that the individual officers had inflicted no constitutional injury. *Id.* at 916. "If a plaintiff established he suffered constitutional injury *by the City*, the fact that individual officers are exonerated is immaterial to liability under § 1983." *Id.* (emphasis in original); *see also Hopkins v. Andaya*, 958 F.2d 881 (9th Cir.1992).

In any event, in this case, the constitutional violations for which we hold the County may be liable occurred *before* the actions of the individual defendants at the jail, so the County is not being held liable for what those deputies did. The County's violations, as we develop later, involved the decision to commit Gibson to the custody of the jail deputies despite his mental illness, and to do so with no direction to treat that illness while he was in jail or to handle him specially because of it.

bility under either route described above. There is evidence from which a jury could properly conclude that the County itself violated Gibson's rights under the Constitution. In addition, there is also evidence from which a jury could properly conclude that the County's failures to act caused its employee to violate Gibson's rights, and that those failures amounted to deliberate indifference under *Canton.*

### B. The First Route to Municipal Liability

 In considering whether a municipality itself violated a person's rights or directed its employee to do so, the focus is on the municipality's "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quoting *Monell,* 436 U.S. at 690, 98 S.Ct. 2018). In this case, drawing all reasonable inferences from the record in favor of Ms. Gibson, we conclude that the County's policies and procedures regarding medical evaluations of incoming detainees violated Gibson's constitutionally protected right to receive medical care while in the custody of the County. Before explaining why the policies violated this right, we first describe the right in more detail.

### 1. The Right to Medical Care While in Custody

 Ms. Gibson alleges that the County violated Gibson's right to receive adequate medical care while in the custody of the County. Because Gibson had not been convicted of a crime, but had only been arrested, his rights derive from the due process clause rather than the Eighth Amendment's protection against cruel and unusual punishment. *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Frost v. Agnos,* 152 F.3d 1124, 1128 (9th Cir.1998); *Carnell v. Grimm,* 74 F.3d 977, 979 (9th Cir.1996).

 With regard to medical needs, the due process clause imposes, at a minimum, the same duty the Eighth Amendment imposes: "persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs." *Carnell,* 74 F.3d at 979. This duty to provide medical care encompasses detainees' psychiatric needs. *Cabrales v. County of Los Angeles,* 864 F.2d 1454, 1461(9th Cir.1988), *vac'd,* 490 U.S. 1087, 109 S.Ct. 2425, 104 L.Ed.2d 982 (1989), *opinion reinstated,* 886 F.2d 235 (9th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1838, 108 L.Ed.2d 966 (1990); *see also Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir.1983); *Ramos v. Lamm,* 639 F.2d 559, 574 (10th Cir.1980). In order to comply with their duty not to engage in acts evidencing deliberate indifference to inmates' medical and psychiatric needs, jails must provide medical staff who are "competent to deal with prisoners' problems." *Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir.1982).

 Under the Eighth Amendment's standard of deliberate indifference, a person is liable for denying a prisoner needed medical care only if the person "knows of and disregards an excessive risk to inmate health and safety."[8] *Farmer,*

---

**8.** Because the Eighth Amendment's deliberate indifference standard looks to the subjective mental state of the person charged with violating a detainee's right to medical treatment, it—somewhat confusingly—differs from the *Canton* deliberate indifference standard, which we also apply in this opinion. The *Canton* deliberate indifference standard does not "turn upon the degree of fault (if any) that a plaintiff must show to make out an underlying claim of a constitutional violation;" instead it is used to determine when a municipality's omissions expose it to liability for the federal torts committed by its employees. *Canton,* 489 U.S. at 388 n. 8, 109 S.Ct. 1197;

511 U.S. at 837, 114 S.Ct. 1970. In order to know of the excessive risk, it is not enough that the person merely "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, [ ] he must also draw that inference." *Id.* If a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk. *Jeffers v. Gomez,* 267 F.3d 895, 914(9th Cir.2001). But if a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the

basis of either his action or his inaction. *Farmer,* 511 U.S. at 842, 114 S.Ct. 1970.

### 2. The Policy

▮▮▮▮ When viewed in the light most favorable to Ms. Gibson, the record demonstrates that the County's failure to respond to Gibson's urgent need for medical attention was a direct result of an affirmative County policy that was deliberately indifferent, under the *Farmer* standard, to this need.[9] To find the County liable under *Farmer,* the County must have (1) had a policy that posed a substantial risk of serious harm to Gibson; and (2) known that its policy posed this risk.[10] *Id.* at 837,

---

*see also Collins v. City of Harker Heights,* 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). As opposed to the *Farmer* standard, which does not impose liability unless a person has actual notice of conditions that pose a substantial risk of serious harm, the *Canton* standard assigns liability even when a municipality has constructive notice that it needs to remedy its omissions in order to avoid violations of constitutional rights. *Farmer,* 511 U.S. at 841, 114 S.Ct. 1970(explicitly distinguishing the two standards on this basis).

**9.** Because that is so, we do not address whether it is necessary to prove the subjective *Farmer* state of mind in suits against entities rather than individuals. *Cf. Farmer,* 511 U.S. at 841, 114 S.Ct. 1970("considerable conceptual difficulty would attend any search for the subjective state of mind of a government entity, as distinct from that of a government official").

Similarly, we do not consider whether there are instances in which pretrial detainees, as opposed to convicted prisoners, may establish a constitutional violation without meeting the *Farmer* deliberate indifference standard. *Frost* applied the *Farmer* standard by analogy to the due process rights of pretrial detainees, but does not indicate whether the subjective standard applies in all such instances. *See Frost,* 152 F.3d at 1128–30.

*Farmer* explained that the protections provided to convicted prisoners are limited because of the presence of the word "punishments" in the Eighth Amendment, basing the subjective standard on the need to prove

"punishment." *Farmer,* 511 U.S. at 838–39, 114 S.Ct. 1970; *see also Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). This limiting word does not, however, appear in the Fourteenth Amendment, and pretrial detainees, not having been convicted, are not subject to punishment. Furthermore, the Fourteenth Amendment ensures that states will provide not only for the medical needs of those in penal settings, but for anyone restricted by a state from obtaining medical care on his own. *DeShaney,* 489 U.S. at 200, 109 S.Ct. 998; *Youngberg v. Romeo,* 457 U.S. 307, 324, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). It is quite possible, therefore, that the protections provided pretrial detainees by the Fourteenth Amendment in some instances exceed those provided convicted prisoners by the Eighth Amendment.

**10.** As noted in the previous footnote, the Supreme Court has commented that it is difficult to determine the subjective state of mind of a government entity. *Farmer,* 511 U.S. at 841, 114 S.Ct. 1970. This statement does not, however, *preclude* the possibility that a municipality can possess the subjective state of mind required by *Farmer.* First, it is certainly possible that a municipality's policies explicitly acknowledge that substantial risks of serious harm exist. Second, numerous cases have held that municipalities act through their policymakers, who are, of course, natural persons, whose state of mind can be determined. *See, e.g., Board of County Comm'rs,* 520 U.S. at 403–04, 117 S.Ct. 1382 (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018).

114 S.Ct. 1970.

On the present record, a jury could conclude that the County's medical screening policies not only posed a substantial risk of serious harm to Gibson, but in fact caused him serious harm. The County's written "Medical Screening" procedures require its medical staff to "check all inmates, upon arrival to the facility, for any obvious signs of sickness or injury requiring medical attention." If an inmate needs medical attention that only a hospital can provide, the County's policy is to take the prisoner to the hospital. According to Washoe County Undersheriff Raymond Wright, this policy also required the medical staff to screen "incoming folks for ... mental illness." Standing alone, these policies are assuredly constitutional. But there is a critical exception to these procedures: "The Medical Screening process *will be delayed* if the inmate is combative, uncooperative or unable to effectively answer questions due to intoxication." (emphasis added).

This mandatory exception to the County's normal medical screening procedures poses a substantial risk of serious harm to those with certain mental illnesses. There is evidence in the record that a common symptom of someone in a manic state is that they are combative and uncooperative. Gibson exhibited that symptom when the police brought him to the jail. *Because* Gibson was combative and uncooperative, no medical evaluation took place,[11] although the police did conduct other booking procedures, such as searching Gibson and photographing him. Stated differently, it was Gibson's urgent medical need

that made him combative and uncooperative, and because Gibson was combative and uncooperative County policy directed the jail's medical staff not to evaluate Gibson to determine if he had an urgent medical need. As a result, Gibson's serious medical needs went untreated, Gibson was jailed rather than hospitalized, and the police treated Gibson as if he were either intoxicated or, as Deputy Miranda stated, "just somebody who was angry and pissed off."

This failure to identify Gibson's urgent medical needs was exacerbated by another County policy regarding prescription medication found with incoming detainees. Under this policy, an officer who discovers medication is to turn it over to a medical staff person, who, in turn, is to place the medication either in "secured property" or "in the Infirmary for follow up care." In accordance with this policy, Deputy Hodges, one of the arresting officers, gave the three containers of prescription psychotropic medication bearing Gibson's name that he found in Gibson's truck to a medical staff member, informing her that he believed the medication was psychotropic.[12] Because the County's directives regarding medication did not include using the medication to determine and alleviate the arrestee's *immediate* medical needs, no one at the jail responded to Gibson's urgent need of medical treatment.

Had the medical staff performed a medical evaluation of Gibson to see if he had a medical condition requiring immediate attention, it could have directed the police to take Gibson to the mental hospital. An

---

11. Counsel for the County stated at oral argument: "The policy is to do a medical evaluation when the person comes in.... Mr. Gibson prevented that from happening by being combative so they put him in a place to calm him down. He didn't calm down. He escalated the situation."

12. Deputy Hodges stated that he said to the nurse: "Here, they were in the truck. I don't if he's taking them. I don't know if they are psychotropics or what." Then, according to Hodges, the nurse told him that "they were mental health kinds of medicines that would stabilize somebody."

evaluation by a trained medical staff member surely would have revealed Gibson's condition. Not only did the medical staff have the clues provided by the psychotropic medication, but Gibson's behavior at the jail was so bizarre that numerous deputies, untrained to diagnose someone in a manic state, took special note of it.[13]

Finally there is evidence in the record to support the inference that if the medical staff had evaluated Gibson, prevented him from entering the jail, and directed him to a mental hospital, Gibson almost certainly would have received the care he needed, rather than face conditions that worsened his outlook. Following Gibson's death the State of Nevada conducted an investigation and interviewed Gibson's psychiatrist, Dr. Tannenbaum, about Gibson and his condition. Dr. Tannenbaum stated that when a person "becomes out of control" due to a manic phase, staff are "always able to manage them in our hospital setting." However, people in a manic state do not do "real well with any type of authority." Because of this vulnerability, people in a manic state are at a particular risk in a penal setting if their situation goes unidentified. "[A] person in the manic state may look like one of the worst … criminal[s] you have, but they're a sick person who we can treat easily and … [who] can easily die in a prison system." As a result, the County's policy of not evaluating incoming detainees who were combative, even when the medical staff had access to medications that would facilitate such an evaluation, posed a particular risk to people—such as Gibson—suffering from a manic state.

The County's liability, however, hinges not only on the existence of a policy that poses a substantial risk of serious harm, but also on whether the County was aware of this risk. *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. Although direct evidence of a person's mental state rarely exists, it is not always necessary to prove a person's subjective awareness, as this inquiry is "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 842, 114 S.Ct. 1970. In this case, a plethora of circumstantial evidence could lead a reasonable jury to infer that the County was aware of the risk that its policies presented.

First, a jury could conclude that County policymakers knew that inevitably some prisoners arrive at the jail with urgent health problems requiring hospitalization. The fact that County policy requires that detainees be checked for medical conditions requiring immediate attention indicates such knowledge.

Second, the County's policies make it clear that policy-makers were keenly aware that mental illness, and manic phases in particular, were within the range of health problems that would sometimes require urgent care. In addition, the policies reveal that the policymakers knew that people in a manic state will sometimes be combative.

Significantly, the County had a detailed policy concerning the administration of psychotropic drugs that, *inter alia,* provides that such drugs must sometimes be forcefully administered on an emergency

---

13. Deputy Hodges stated that because of Gibson's "mood swings" he believed that Gibson "was mentally ill and wasn't taking his meds, or he was on some kind of drug." Deputy Eric Nagl stated "it was weird how he was acting" and that his behavior "was almost like a light switch." And Deputy Mike Gar-row stated that Gibson's cursing was not of "the type that you hear from someone that's just … drunk … this was someone that was obviously upset … and irrational, incoherent … not incoherent to where you can't hear … or understand what they're saying, but incoherent to making sense."

basis because an imminent danger to the prisoner or others might exist.[14] In addition, County policy requires placing "inmates with mental disorders that become combative [or] violent" in special watch cells. Another policy requires frequent checking of prisoners in medical unit cells "who are violent, mentally disordered, or demonstrating bizarre/unusual behavior." And still another policy requires the presence of a mental health technician to be present at the jail five days a week. Additional testimony by Sheriff Kirkland further indicates that the policymakers knew that they needed to deal safely and effectively with the special challenges posed by the mentally ill: "Certainly it's well-known that the Washoe County jail is the second or third largest houser of people who have mental difficulties in the state, including the Nevada Mental Health Institute."

Third, the record suggests that the County not only knew that it had to treat the mentally ill in order to avoid harm, but that it had made a practice of ignoring this need. Until 1995, the County had a full-time mental health professional on site at the jail to perform mental health screenings of detainees. A reasonable jury could infer that this program existed because the County had recognized that it needed such a program in order to provide adequate mental health care to detainees and to avoid serious harm caused by the lack of such care. In 1995, the County dropped its mental health professional position—and did not fill it for four years—not because jail policymakers concluded it was unnecessary, but, according to the record before us, because of what Sheriff Kirk-

land described as "a very bad relationship" between state psychiatric hospital officials who supplied the psychiatric personnel, the jail's medical staff, and the sheriff's department. That the County tolerated such a long lapse in this service for such a trivial and arbitrary reason as a personality conflict demonstrates that the County chose to ignore the acknowledged mental health needs of detainees.[15]

We note that the question of whether the County policies violated Gibson's rights does not hinge on whether County policymakers knew that the County's policies would pose a substantial risk of serious harm to *Gibson,* in particular. As long as a jury can infer that the policymakers knew that their policy of not screening certain incoming detainees would pose a risk to someone in Gibson's situation, we must reverse the summary judgment in favor of the County. *Farmer,* 511 U.S. at 843–44, 114 S.Ct. 1970 ("it does not matter ... whether a prisoner faces an excessive risk ... for reasons personal to him or because all prisoners in his situation face such a risk" and when prison officials know of rampant inmate rape and do nothing about it, "it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom"); *Redman,* 942 F.2d at 1448.

The County emphasizes the facts that Gibson had an unhealthy heart and that his autopsy listed severe coronary arteriosclerosis as the cause of his death. As a result, the County argues that it was not deliberately indifferent to Gibson's serious medical need because "[t]he serious medi-

14. This portion of the psychotropic drug policy states: "Pyschotropic medications will not be forcefully administered by healthcare staff unless a court order exists or there is imminent danger to self or others."

15. The record is not clear about the precise role of the mental health screening professional. If the job description's duties included screening incoming detainees for mental illness, then all the more basis exists to conclude that the County knew of the need to screen incoming detainees for mental illness and chose to ignore it.

cal need at issue in this case was Mr. Gibson's coronary disease, not his mental health condition."

This argument is, as we understand it, not one about causation—on the summary judgment record a jury easily could conclude that the County caused Gibson's death. Indeed, the County's medical expert Dr. Charles Welti recognized that Gibson's "physiologically stressful state" resulted in Gibson's fatal heart attack.

Instead, the County's argument is about foreseeability: Even if the County was deliberately indifferent to Gibson's mental health condition, this deliberate indifference did not cause Gibson's death because the County neither knew nor had reason to know that a fatal heart attack would result from ignoring Gibson's severe mental health condition.

We reject this argument for two reasons. In the first place, there is sufficient evidence in the record on which a jury could find that death *is* a foreseeable result of not treating a manic person and placing him in a penal setting. As noted earlier, in an interview with the Nevada Department of Investigation, Dr. Tannenbaum testified that an untreated person in a manic state "can easily die in a prison system," [16] and that a rapid pulse and increased blood pressure are commonly associated with manic bouts. Although the precise way in which Gibson died may not have been foreseeable, the extreme stress on Gibson's system and the possibility that this stress would trigger a fatal reaction of some sort were foreseeable.

Second, even if the County is correct that death was not a foreseeable consequence of its deliberate indifference, this argument does not exonerate the County. Death was not the only injury Gibson suf-

fered at the hands of the County. Instead of attending to Gibson's serious medical needs, the County reacted to Gibson's illness by locking him in a cell, pepper spraying him, shackling him for several hours by the hands, feet, and waist, dragging him through the corridor, and having two deputies climb on top of him. The likely result, a jury could find, was severe psychological and physiological distress. A plaintiff may recover from a municipality for far less severe injuries in a suit of this nature. *Cf. Canton*, 489 U.S. at 381, 109 S.Ct. 1197(allowing cause of action for failure to provide medical care action to proceed when municipal officials left a woman with severe emotional ailments lying on a police station floor for an hour).

In addition, these injuries were indisputably foreseeable. Uncontrollable behavior is a foreseeable consequence of not identifying a manic condition, and having to chain, pepper spray and drag someone, with attendant psychological and physiological harm, is a foreseeable consequence of dealing with someone who is out of control.

■ The "time-honored legal principle that a wrongdoer takes his victim as he finds him" means that if the County is liable for Gibson's other injuries it also must bear liability for Gibson's death. *Wakefield v. Nat'l Labor Relations Bd.*, 779 F.2d 1437, 1438 (9th Cir.1986). Sometimes referred to as the "eggshell skull" doctrine, this principle renders defendants liable for any physical injury they cause, no matter how unforeseeable, once they inflict harm on a plaintiff's body. As a leading torts hornbook states:

> There is almost universal agreement upon liability beyond the risk, for quite unforeseeable consequences, when they

---

**16.** It appears from the transcript of this interview that Dr. Tannenbaum elaborated on this possibility. However, because this transcript

of the interview is only partly legible, an accurate quotation of this elaboration is not possible.

follow an impact upon the person of the plaintiff.

It is as if a magic circle were drawn about the person, and one who breaks it, even by so much as a cut on the finger, becomes liable for all resulting harm to the person, although it may be death.... The defendant is held liable for unusual results of personal injuries which are regarded as unforeseeable, such as ... heart disease.... The defendant of course is liable only for the extent to which the defendant's conduct has resulted in an aggravation of the pre-existing condition, and not for the condition as it was; but as to the aggravation, foreseeability is not a factor.

W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 43 at 291–92.

Because "§ 1983 creates a species of tort liability" the Supreme Court "has interpreted the statute in light of the background of tort liability." *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 216 F.3d 764, 783 n. 34 (9th Cir.2000) (quoting *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999)), *aff'd*, 535 U.S. ——, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). We see no reason for diverging from the Supreme Court's general guidance in this situation. Although the delib-

erate indifference doctrine contains a heightened foreseeability requirement, this requirement differs from the traditional negligence foreseeability requirement only insofar as deliberate indifference requires the defendant to be *subjectively* aware that *serious* harm is likely to result from a failure to provide medical care. But the deliberate indifference doctrine does not require that a *particular* consequence be more predictable than is required under traditional tort law. Accordingly, the First Circuit has approved of the use of the eggshell skull doctrine in a § 1983 case with similar facts. *Figueroa–Torres v. Toledo–Davila*, 232 F.3d 270, 274–76 (1st Cir. 2000) (police officers may be liable for death of a person with a diseased and enlarged spleen even though the death was not a foreseeable consequence of the police's hitting and kicking).[17]

For the above reasons, the County's policies posed a substantial risk of serious harm to Gibson, and enough circumstantial evidence exists that a reasonable jury could infer that County policymakers knew that this risk existed and chose to ignore it.

### C. The Second Route to Municipal Liability

To impose liability against the County under *Canton*, a plaintiff must

---

17. The pattern of lapses in communicating the ATLs in this case is regrettable, and probably negligent, but, under these facts, it does not violate Gibson's substantive due process rights. With some exceptions, including when a person is in police custody or when an officer's conduct places a person in peril, "[t]he 14th Amendment does not generally require police officers to provide medical assistance to private citizens." *Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997) (citing *DeShaney*, 489 U.S. at 197, 109 S.Ct. 998). Thus, prior to Gibson's arrest, the police had no duty to provide medical assistance to Gibson. As a result, the County's deficient system for communicating ATLs

cannot be the basis for a violation of Gibson's right to receive medical services prior to Gibson's arrest.

Once the police arrested Gibson, however, he was in police custody and the police did have a duty not to remain deliberately indifferent to his serious medical needs. *DeShaney*, 489 U.S. at 199–200, 109 S.Ct. 998. But no evidence supports the inference that the County's policymakers knew that the County's defective policies for communicating police dispatches between shifts and between field and jail employees created a substantial risk of serious medical harm to those people placed in police custody. *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970.

show: (1) that a County employee violated Gibson's rights; (2) that the County has customs or policies that amount to deliberate indifference (as that phrase is defined by *Canton*); and (3) that these policies were the moving force behind the employee's violation of Gibson's constitutional rights, in the sense that the County could have prevented the violation with an appropriate policy. *Amos v. City of Page*, 257 F.3d 1086, 1094 (9th Cir.2001).

### 1. A County Employee Violated Gibson's Rights

■ As the record now stands, a jury could find that the nurse who was on duty at the jail on the night of Gibson's death was deliberately indifferent to Gibson's serious medical needs. As discussed above, for the nurse to have been deliberately indifferent (as the phrase is defined by *Farmer*) to Gibson's needs, she must have been aware of a substantial risk of serious harm. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970; *Frost*, 152 F.3d at 1128–30.

A jury could find that the nurse knew that Gibson was in the throes of a manic state on the basis of three facts: she had medical training, she knew that Gibson was exhibiting behavior consistent with mental illness,[18] and she knew that Gibson possessed psychotropic medication "that would stabilize somebody." A jury could also conclude that a trained nurse would know that hospitalization could have relieved Gibson's condition, and that if Gibson remained in jail, he presented a danger both to himself and to others. If the nurse knew that a substantial risk to Gibson's health existed and she declined to act upon this knowledge, she was deliberately indifferent to Gibson's constitutional right to receive medical care.

### 2. Deliberate Indifference under Canton

■ A jury could find, on the present record, that the nurse's constitutional violation arguably resulted from an omission in the County's policy regarding the handling of prescription medication.[19]

■ In *Canton*, the Supreme Court held that a "failure to train" police officers may serve as the basis for liability under § 1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 388, 109 S.Ct. 1197. Policies of omission regarding the supervision of employees, then, can be "policies" or "customs" that create municipal liability under *Monell*, but only if the omission "reflects a 'deliberate' or 'conscious' choice" to countenance the possibility of a constitutional violation. *Id.* at 389–90, 109 S.Ct. 1197; *see also Oviatt*, 954 F.2d at 1474 ("[A] local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights."). A jury may infer that a municipality made such a deliberate choice "when a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs*, 520 U.S. at 410, 117 S.Ct. 1382. Whether a

---

18. When asked if he told the medical staff that Gibson was "demonstrating bizarre behavior consistent with someone who was mentally ill," Deputy Hodges responded: "Yes, they would have known the story because he was combative at that time.... [W]e were telling everybody what happened, you know, with the mood swings in particular. I don't know how much detail I would have went into. I would have mentioned the mood swings. To me, that was the significant factor."

19. As was her prerogative, Ms. Gibson did not name the nurse as a defendant. This fact does not affect our determination that the nurse may have committed a constitutional violation and, in the event that she did, whether the County is legally responsible for that violation.

local government has displayed a policy of deliberate indifference to the constitutional rights of its citizens is generally a jury question. *Oviatt*, 954 F.2d at 1478; *Blair v. City of Pomona*, 223 F.3d 1074, 1079 (9th Cir.2000).

The *Canton* Court recognized that when the need to remedy the omission "is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, . . . the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390, 109 S.Ct. 1197. The need to act may be obvious because any reasonable person would recognize the need; for example, because armed officers will often arrest fleeing felons, it is obvious that a municipality must train its officers in the constitutional limitations on the use of deadly force. *Id.* at 390 n. 10, 109 S.Ct. 1197. Unlike the deliberate indifference standard used to determine if a violation of a detainee's right to receive medical care took place, this standard does not contain a subjective component. *Farmer*, 511 U.S. at 841, 114 S.Ct. 1970. As a result, there is no need for Ms. Gibson to prove that the County policymakers actually knew that their omissions would likely result in a constitutional violation.

In this case, the County had a policy that required the arresting officers to give the nurse any prescription medications found with an incoming detainee. The policy further required the nurse to either place the medications in "secured property or in the Infirmary for follow up care." Significantly, the policy failed to suggest that the nurse should act on any information that the medication might bear, even in the event that the nurse was unable to perform a medical evaluation because city policy precluded medical evaluations when the detainee is uncooperative, combative, or intoxicated.

A jury could also find that this omission was sufficiently likely to result in the violation of a detainee's right to medical care that the County was deliberately indifferent to these needs. As discussed above, County officials actually knew that some detainees who arrived at the jail would have urgent medical and mental health needs requiring immediate hospitalization. The policymakers also knew that people suffering from mental illness are sometimes combative. In addition, the County had created a mental health screening position, so policymakers knew that jail employees needed to identify and address mental illnesses in order not to neglect the medical needs of prisoners.

Given that the County policymakers actually knew that the jail staff would regularly have to respond to detainee mental health needs, it should have been obvious that the County's omission could well result in a constitutional violation.[20] Because county policy forbids medical evaluations on incoming detainees who are combative and uncooperative, it was obvious that

---

20. *Canton* itself concerned a claim that the defendant City had failed to train its police officers in dealing with the emotionally disturbed. Concurring in part and dissenting in part, Justice O'Connor wrote that "the diagnosis of mental illness is not one of the 'usual and recurring situations with which [the police] must deal,' " . . . such that lack of training therein would be "the kind of omission that can be characterized, in and of itself, as a 'deliberate indifference' to constitutional rights." 489 U.S. at 397, 109 S.Ct. 1197

(O'Connor, J., concurring in part and dissenting in part) (citing *Canton*, 489 U.S. at 391, 109 S.Ct. 1197). Even if this claim is correct in the absence of a record to the contrary, it is not correct on the record in this case. Sheriff Kirkland testified that the Washoe County jail housed more mentally ill people than all but a handful of Nevada institutions. As a result, whatever can be said of jails in general, the necessity of diagnosing mental illness is a usual and recurring situation in the Washoe County jail.

someone who had a mental illness that made them combative and uncooperative would not be evaluated. If, however, a combative detainee arrives with prescription psychotropic medication in their own name, there is an alternative way to identify those with medical needs. Although a jury could conclude that the nurse actually did identify Gibson as a person in need of mental health treatment, the County's medication policy did not instruct her to act upon this realization. When policy-makers know that their medical staff members will encounter those with urgent mental health needs yet fail to provide for the identification of those needs, it is obvious that a constitutional violation could well result.

### 3. Moving Force

██ Having determined that summary judgment is inappropriate on the question whether the County's omission amounted to deliberate indifference to the constitutional rights of citizens with whom the sheriff's department came into contact, we must consider whether these omissions were the "moving force" behind the violation of Gibson's constitutional rights. We find that there is sufficient evidence to preclude summary judgment on this question as well.

██ In order to be a "moving force" behind Gibson's injury, we must find that the "identified deficiency" in the County's policies is "closely related to the ultimate injury." *Canton,* 489 U.S. at 391, 109 S.Ct. 1197; *see also Oviatt,* 954 F.2d at 1478. The plaintiff's burden is to establish "that the injury would have been avoided" had the County had a policy directing its medical staff to use information obtained from prisoner's medication to determine whether he should be jailed or hospitalized and, if the former, under what conditions. *Oviatt,* 954 F.2d at 1478.

Had the County had a policy instructing the medical staff to use information obtained from a prisoner's medication to screen incoming detainees, the nurse, after observing Gibson's behavior in light of his medication, likely would have concluded that Gibson was in the midst of a manic phase and recommended transporting him to a mental hospital. There, Gibson could have received the treatment he needed, rather than face conditions that only made his outlook worse. Alternatively, the nurse could have considered administering the medication on an emergency basis.

### II. Individual Deputies' Liability

### A. Deliberate Indifference to Medical Needs

██ The individual defendants in this case were the sheriff's deputies who had contact with Gibson after he was admitted to the jail. Their behavior, while it proved fatal to Gibson, was not unconstitutional. The record does not support the conclusion that the individual defendant deputies were deliberately indifferent, under the subjective *Farmer* standard, to Gibson's mental health condition.

Of all the individual officers who had contact with Gibson on the night of his death, only Miranda and Hodges knew that Gibson's behavior might be connected to mental illness, because they found and discussed Gibson's prescription medications. Miranda and Hodges are not defendants, however, and there is no evidence that, upon bringing Gibson into the jail, they told any of the deputies there (as opposed to the nurse) about the medicine containers. Similarly, there is no evidence that, having received the medicine containers from Miranda and Hodges, the nurse on duty—also not a defendant—informed any of the individual deputy defendants that Gibson's medications suggested that he was mentally ill. According to the sum-

mary judgment record, only Deputy Bowlin was even aware that any drug containers came into the jail with Gibson, but he did not know what the medications were, or their purpose.

In short, all the deputies at the jail knew about Gibson's mental condition was what they could observe of his behavior. Although several remarked on his peculiar mood swings and dramatic shifts from combativeness to compliance, there is no evidence that any of them actually knew that this behavior connoted serious, treatable mental illness. Nor can we say that Gibson was so obviously mentally ill that the deputies, who had received no training regarding the diagnosis and treatment of mental illness, must have known that Gibson was exhibiting symptoms of mental illness. The lapses in communication at the jail are hardly commendable, but the deputies who, because of these lapses, remained unaware of Gibson's mental condition cannot be held liable for having been "deliberately indifferent" to it. *See Farmer*, 511 U.S. at 838, 114 S.Ct. 1970.

### B. *Excessive Force*

 Ms. Gibson claims that the individual defendant deputies used excessive force in restraining Gibson, resulting in his death. The magistrate found that the force used by the deputies was reasonable, and therefore, that the defendants were not liable. We agree.

 The Due Process clause protects pretrial detainees from the use of excessive force that amounts to punishment. *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Although the Supreme Court has not expressly decided whether the Fourth Amendment's prohibition on unreasonable searches and seizures continues to protect individuals during pretrial detention, *id.*, we have determined that the Fourth Amendment sets the "applicable constitutional limitations" for considering claims of excessive force during pretrial detention. *Pierce v. Multnomah County*, 76 F.3d 1032, 1043 (9th Cir.1996), *cert. denied*, 519 U.S. 1006, 117 S.Ct. 506, 136 L.Ed.2d 397 (1996). *Graham* therefore explicates the standards applicable to a pretrial detention excessive force claim in this circuit.

 In *Graham*, the Supreme Court explained that determining whether a defendant officer's use of force was "reasonable" under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." 490 U.S. at 396, 109 S.Ct. 1865 (internal quotations omitted). This analysis requires "careful attention to the facts and circumstances in each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.; see also Tennessee v. Garner*, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (whether seizure is reasonable under the Fourth Amendment is judged by the "totality of the circumstances").[21]

 Finally, the *Graham* Court admonished courts to examine the circumstances underlying a Fourth Amendment claim from the viewpoint of the reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." 490 U.S. at 396, 109 S.Ct. 1865. For, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in

---

**21.** In the context of pretrial detention rather than arrest, it is clear that all the factors mentioned in *Graham*—whether the suspect is resisting arrest or attempting to flee, for example—will not necessarily be relevant.

circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865.

Applying these standards to the case before us, we conclude that the individual defendant deputies cannot be held liable for the use of excessive force against Gibson. From the moment Gibson arrived at the jail, he was struggling against the deputies, hurling invective, and generally behaving very strangely and violently. Because we have determined that there is no proof the deputies on duty at the jail were aware that Gibson's behavior was connected to his treatable mental illness, we cannot hold them accountable for having treated Gibson as a dangerous prisoner rather than a sick one, despite the tragic consequences of this error.

Given that perspective at the time, the deputies' conduct that night was reasonable. Because he was alone in his holding cell when he slipped out of his waist chain and began banging it against the window, Gibson—at that point—posed no immediate danger to anyone but himself. But Sgt. Williams was concerned that Gibson might shatter the window in his cell door, thereby placing both himself and any officers who might have to enter the cell at risk of harm. The decision to enter Gibson's cell and restrain him was therefore reasonable.

Moreover, once the deputies began to restrain Gibson and move him to the special watch cell, he fought back vigorously. No more than three minutes passed from the time the deputies brought Gibson into the special watch cell and his death. During that time, Gibson was fighting hard against the deputies' efforts to restrain him, creating precisely the kind of situation in which officers must make split-second decisions. Under all the circumstances, the deputies' decisions under these difficult circumstances resulted in restraining Gibson no more forcefully than was reasonably necessary. We therefore affirm the district court's grant of summary judgment for the individual deputy defendants and Sgt. Williams.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Each party to bear its own costs on appeal.

REINHARDT, Circuit Judge, concurring:

While I concur fully in the court's opinion, I write separately to expand on a point that the opinion relegates to a footnote (n.9). Although *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), establishes a subjective test for determining deliberate indifference in the case of individual defendants, in that case the Supreme Court made it reasonably clear that the same standard does not apply in actions against government entities involving the adoption of affirmative government policies. The *Farmer* Court stated that, while a subjective standard is appropriate for determining the liability of prison officials, "considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official." *Id.* at 841, 114 S.Ct. 1970.

Here, whether we import the more stringent *Farmer* subjective standard or apply the less stringent objective standard employed in *City of Canton v. Harris*, 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989),[1] the record, when

---

1. *See also Farmer,* 511 U.S. at 841, 114 S.Ct. 1970 ("It would be hard to describe the *Canton* understanding of deliberate indifference ... as anything but objective. *Canton* 's ob-

jective standard, however, is not an appropriate test for determining the liability of prison officials under the Eighth Amendment as interpreted in our cases.").

viewed in the light most favorable to Ms. Gibson, shows that the County's failure to respond to her husband's medical needs was a direct result of an affirmative County policy that demonstrated deliberate indifference to this need. Thus, there is no cause in this case to resolve definitively the question of which standard applies to the County, regardless of how obvious the answer may be. We can instead, for purposes of this decision, simply apply the more stringent standard.