351 F.3d 410
 John Kenneth LOLLI, Plaintiff-Appellant,
v.
COUNTY OF ORANGE, a political subdivision of the State of California; Michael S. Carona, individually and as Sheriff of Orange County; John Rocky Hewitt, individually and in his official capacity (Assistant Sheriff); Toledo, individually and in his official capacity (Sheriff Sergeant) aka Doe 3; Meyer, individually and in his official capacity (Sheriff Sergeant) aka Doe 4; Walker, individually and in their official capacities (Sheriff Deputies) aka Doe 5-8; Baum, Deputy individually and in his official capacity aka Does 9-10; Finlay, Deputy individually and in his official capacity aka Does 5-8; Kent, Deputy individually and in his official capacity aka Does 5-8; Richards, Deputy individually and in his official capacity aka Does 5-8; Breaton, Deputy individually and in his official capacity aka Does 9-10, Defendants-Appellees.
 No. 02-56309.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 4, 2003.
 Filed November 21, 2003.
 
 Robert L. Bastian, Jr., and Marina R. Dini, Law Offices of Bastian & Dini, Los Angeles, California, for the plaintiff-appellant.
 Albert P. Ballog, Jr., and Daniel R. Sullivan, Sullivan, Struck & Ballog, L.L.P., Santa Ana, California, for the defendants-appellees.
 Appeal from the United States District Court for the Central District of California; Alicemarie H. Stotler, District Judge, Presiding. D.C. No. CV-00-00291-AHS.
 Before Stephen REINHARDT, Diarmuid F. O'SCANNLAIN and Raymond C. FISHER, Circuit Judges.
 Opinion by Judge FISHER; Partial Concurrence and Partial Dissent by Judge O'SCANNLAIN
 OPINION
 FISHER, Circuit Judge.
 
 
 1
 John Kenneth Lolli brought this 42 U.S.C. § 1983 case against Orange County and a number of the Orange County Sheriff's Department officers challenging his treatment in the Orange County Men's Jail in October 1999. He claims that the officers violated his federal constitutional rights and state law through the excessive force they used against him and their deliberate indifference to his serious medical needs related to his Type I diabetes. The district court granted summary judgment in favor of the County and the officers and dismissed the case. Lolli filed a motion for reconsideration, which the district court denied. Lolli now appeals, arguing that genuine issues of material fact prevent summary judgment. We agree with Lolli as to his claims against some of the individual officers and we therefore affirm in part, reverse in part and remand.
 
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 
 2
 At approximately 6:30 P.M. on October 5, 1999, the night of Lolli's 34th birthday, an Orange County Sheriff's Department deputy stopped him for a bicycle infraction and then arrested him for an outstanding warrant on an unpaid parking ticket. Lolli told the arresting officer that he is diabetic and felt ill and that he needed to eat as soon as possible. After he was taken to the Orange County Men's Jail, he relayed that same information to the screening nurse, Nurse Salazar. Salazar tested his blood sugar, recorded his diabetic status on her chart and allegedly assured Lolli he would receive food promptly. Her records reflect that Lolli was not combative, verbally abusive or agitated at intake. Lolli was moved to a small cell, then taken for an x-ray and finally placed in a holding cell with about a dozen other men. He remained there without food or insulin — and was unable to communicate with any officers — until around midnight.
 
 
 3
 What transpired after Lolli had been in that holding cell for approximately four hours is the subject of much dispute. At his deposition, Lolli testified that he "in all respect" informed a deputy who entered the holding cell that he is diabetic and was not feeling well, and he asked the deputy to find out what happened to the snack Nurse Salazar had promised. Lolli claims that a deputy thereupon grabbed him and pulled him to the ground and then several deputies kicked him, punched him, hit him with batons or similar objects, twisted his arms and legs, poked his face, knuckled his ear and pepper sprayed him. This abuse continued, he testified, even after his hands were handcuffed behind his back. After Lolli was taken to a medical observation cell, deputies bent his spine and pounded his head on the ground. Lolli denies resisting or "do[ing] anything to anybody in there." Lolli also claims that his diabetes was not properly treated, and he was not given the appropriate insulin or food to regulate his blood sugar.
 
 
 4
 The officers' version of the story, unsurprisingly, is very different.[1] Several officers admit that they struck Lolli, grabbed one of his arms or legs or sprayed him with pepper spray, but they testified that Lolli was: (1) verbally abusive and disruptive; (2) unresponsive to orders; (3) combative; (4) struggling and resisting; (5) swinging one cuffed hand around; and (6) posing a danger to himself and the officers. They denied kicking Lolli or using batons on him, and they also denied knowing that Lolli was a diabetic or needed food or insulin.
 
 
 5
 After Lolli was released around 11 P.M. on October 6, his sister took him to Huntington Beach Hospital. There, medical personnel examined him and took x-rays. The hospital's records from that date show that Lolli had bruises, open wounds, lacerations, lumps on his head and wrists, a perforated ear drum and three fractured ribs. The hospital staff summoned the Huntington Beach Police Department. The Huntington Beach officers took a report but did no further investigation after calling the Orange County Sheriff's Department. Photographs taken by the Huntington Police Department show many of the injuries described in the hospital records. After his release date, Lolli returned to the hospital with problems allegedly stemming from the force the officers used against him.
 
 
 6
 On March 30, 2000, Lolli filed his complaint in federal court. After discovery, the County and the officers moved for summary judgment. Lolli opposed their motion, submitting evidence and pointing to disputed facts that he claimed prevented a grant of summary judgment against him. The district court, after a hearing, granted the motion on February 28, 2002. The order, as well as its statement of facts and conclusions of law, made no mention of Lolli's allegedly disputed facts or of his medical claim.[2] It awarded costs, "including reasonable attorneys' fees," to the County and the officers.
 
 
 7
 Rather than immediately appealing the grant of summary judgment, Lolli filed a motion for reconsideration. The district court denied this motion on July 8, 2002. Among other things, it stated that "[p]laintiff's claims, analyzed under the Fourth Amendment as a non-medical detention, cannot stand as against defendants' qualified immunity defense," although the officers had not mentioned qualified immunity in their summary judgment motion or in their opposition to the motion for reconsideration. On July 26, Lolli filed a notice of appeal listing only the July 8 order. We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 STANDARD OF REVIEW
 
 
 8
 The denial of a motion for reconsideration is reviewed for an abuse of discretion. See Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 883 (9th Cir.2000). In contrast, we review a grant of summary judgment de novo. See Oliver v. Keller, 289 F.3d 623, 626 (9th Cir.2002). When considering a grant of summary judgment, "[v]iewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." Id.
 
 
 DISCUSSION
 
 A. The Notice of Appeal
 
 9
 We review the district court's grant of summary judgment — not simply its denial of Lolli's motion for reconsideration — although Lolli did not list the order granting summary judgment in his timely notice of appeal. Ordinarily, Lolli's appeal of the February 28 summary judgment order would have been due by April 1, within 30 days of entry of judgment. Fed. R.App. Pro. 4; 26. Because Lolli filed a motion under Federal Rules of Civil Procedure 59(e) and 60(b) on March 11, this 30-day limit was tolled and began to run anew on July 10, the date the district court entered judgment on the motion for reconsideration. Fed. R.App. Pro. 4(a)(4)(iv), (vi). Lolli filed his notice of appeal on July 26, and it was therefore timely.[3]
 
 
 10
 Federal Rule of Appellate Procedure 3(c)(1)(B) provides that the notice of appeal must "designate the judgment, order, or part thereof being appealed." When, as here, a party seeks to argue the merits of an order that does not appear on the face of the notice of appeal, we generally consider two factors: (1) whether "the intent to appeal a specific judgment can be fairly inferred" and (2) whether "the appellee [was] prejudiced by the mistake." See Montes v. United States, 37 F.3d 1347, 1351 (9th Cir.1994) (internal quotation marks omitted). Both factors favor Lolli. Lolli's intent to appeal the summary judgment order can be inferred, as we frequently have done when a party appeals after its motion for reconsideration was denied. See, e.g., United States v. Belgarde, 300 F.3d 1177, 1180 (9th Cir.2002) (reviewing a dismissal of an indictment rather than denial of reconsideration where the notice of appeal did not "specify the order being appealed"); McCarthy v. Mayo, 827 F.2d 1310, 1313-14 (9th Cir. 1987) (reviewing a summary judgment order when the notice of appeal listed only the denial of motions under Rule 60(b) but that denial simply referred to the reasons given in the underlying order). Prejudice to the County and the officers, however, cannot. Lolli's full discussion of the summary judgment order in his opening appellate brief and the detailed response in the County and the officers' answering brief dispose of any claims that they were misled or harmed. See, e.g., id. at 1314 ("The defendants cannot claim prejudice because they also fully briefed the issues.").
 
 
 11
 Although the notice of appeal can be read to include both orders, we review the merits of the grant of summary judgment alone. Lolli simply mentioned the denial of the motion for reconsideration in his brief, but then articulated neither the standard for reviewing a motion for reconsideration nor any reason why he believes the denial of reconsideration, rather than the grant of summary judgment, was in error. This is insufficient to preserve the matter for appeal. See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir.2001).
 
 B. The Municipal Liability Claim
 
 12
 We affirm the district court's grant of summary judgment on Lolli's municipal liability claim against Orange County. The district court concluded that "there is no policy, custom or practice of Defendants which would support 42 U.S.C. § 1983 causes of action," and Lolli has not made any distinct arguments on appeal directly challenging this conclusion, nor has he presented evidence that through its omissions Orange County should be held responsible for the constitutional violations of its employees. See Gibson v. County of Washoe, 290 F.3d 1175, 1185-86 (9th Cir.2002) (outlining "two routes" under which a plaintiff can successfully hold a county liable for inflicting a constitutional injury — by showing that the county itself violated a right or directed an employee to do so, or, in "limited situations," by showing that the county's deliberate indifference led to an omission in its policies that caused an employee to violate a right). Accordingly, the remainder of this opinion deals only with the claims brought directly against the Orange County Sheriff's Department officers.
 
 C. The Excessive Force Claim
 
 13
 "[T]he Fourth Amendment sets the applicable constitutional limitations for considering claims of excessive force during pretrial detention." Gibson, 290 F.3d at 1197 (internal quotation marks omitted). We therefore evaluate Lolli's claim under this amendment's objective reasonableness standard. See Pierce v. Multnomah County, 76 F.3d 1032, 1043 (9th Cir.1996). "[T]he `reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are `objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In considering an excessive force claim, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396, 109 S.Ct. 1865 (internal quotation marks omitted).[4] Because this balancing "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." Santos v. Gates, 287 F.3d 846, 853 (9th Cir.2002). To defeat summary judgment, Lolli must show that a reasonable jury could have found that the officers' use of force was excessive. See Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir.1998). As to seven of the officers, he did.
 
 
 14
 In support of his excessive force claim, Lolli has submitted a fair amount of evidence, from which a reasonable jury could conclude that the force used against him was excessive. Lolli testified that after he had been in a holding cell with approximately a dozen other men for about four hours, he became "panicked" and "fearful" because of his untreated diabetic condition. When the door to the cell finally opened and a number of deputies entered, Lolli told a deputy "in all respect" that "I'm diabetic and feeling very sick and I was long overdue on food and they told me some food was coming. I asked him if he would find out what happened to the snack that the nurse told me what [sic] I have." Lolli testified that the deputy responded, "Where the fuck do you think you are, the Holiday Inn?" and Lolli said, "I know where I'm at. I'm sick and I need food."
 
 
 15
 Lolli testified that the deputy told Lolli to step forward, and the deputy then grabbed Lolli's shirt, pulled him toward the cell exit and down to the ground. When asked if he had put up his arms or done anything in response, Lolli stated that there was almost no time to do anything before he hit the ground. Lolli hit the floor with his shoulder and elbow, on his right side. When he was brought to the ground, about six other officers were surrounding him. Lolli then testified that "in no time at all, I'm feeling blows to my back" and he saw boots, a baton and hands, but he was not able to identify anyone who struck him with a foot, hand or baton. In his peripheral vision, he saw officers' legs kicking him in the back and upper torso. He also saw a deputy use both hands to wield a baton, and he was hit by the baton at least three times. The officers held each of Lolli's arms and legs and were twisting them, and they tried "to mess up my mouth and face."
 
 
 16
 Lolli testified that the beating lasted a few minutes. He stated that he was handcuffed before the beating stopped and that he was kicked, hit or twisted about 10 times after he was cuffed. Lolli was also pepper sprayed in the face, and he stated that "I'd be hard-pressed to believe there was anything left in the can." Lolli testified that an officer beat Lolli's head against the pavement about a dozen times and "got in my ear with all of his weight and a knuckle" and "the skin in this whole area [of my ear] came off." Lolli testified that he never kicked anyone, that he "didn't do anything to anybody in there," and that the only thing he did was tense up his body to protect himself from the blows.
 
 
 17
 Lolli testified that after the beating, several officers carried him to a medical observation cell and dropped him on the floor. They then twisted his spine, bent his ribs as his heels were pulled toward his head and put a foot or knee on his back. He testified that there was blood throughout the cell because his head had been bleeding for most of the first hour he was there. The following morning, while still in the observation cell, Lolli "had broken ribs, my head was throbbing, my whole head hurt, my ear was just a pain I would not wish on anyone in my ear, my ribs were to the point I could hardly breathe, I couldn't take more than a shallow breath. My joints, I couldn't hardly balance myself to stand up. My eyes were still burning."
 
 
 18
 Intake documents show that Lolli had no injury or medical problem, other than his diabetes, upon arrival at the jail. Jail clinical records show that after his arrival, Lolli was "involved in an altercation" and had a forehead contusion, abrasions on his upper back and both eyes and some problem with his ribs. He experienced soreness all over his body and had multiple, very reddened abrasions and contusions, especially on his back, and a swollen finger. His arms also showed visible handcuff grooves. The Huntington Beach Hospital records show that Lolli had bruises, open wounds, lacerations, lumps on his head and wrists, a perforated ear drum and three fractured ribs.
 
 
 19
 Taking this evidence in the light most favorable to Lolli, we conclude that he has met his burden in opposing summary judgment. A jury could conclude that the alleged intrusion on Lolli's Fourth Amendment interests, gauged by the "type and amount of force inflicted," Deorle v. Rutherford, 272 F.3d 1272, 1279 (9th Cir. 2001) (internal quotation marks omitted), was substantial. Lolli's injuries were apparently painful and serious, and their effects were lasting. See Santos, 287 F.3d at 853-54 (holding that the nature of the intrusion was severe where arrestee suffered broken vertebra that caused pain and immobility). The alleged force in the form of kicking, punching and using a baton on a detainee does not seem to be "minimal" intrusion. See Headwaters, 211 F.3d at 1134-35 (a jury could find that the severity of intrusion by pepper spray alone was more than minimal).[5] But see Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir.2001) (concluding that an intrusion was minimal despite the arrestee's broken finger and irritated eyes). Given Lolli's testimony, a jury could conclude that little to no force was necessary or justified here. See Headwaters, 211 F.3d at 1133 ("[W]here there is no need for force, any force used is constitutionally unreasonable.").
 
 
 20
 Even though Lolli has not been able to identify precisely which officer delivered which alleged blow or use of force, he has developed and presented sufficient evidence from which a jury could infer that the individual officers who had physical contact with Lolli participated in the alleged beating. Lolli has done more than simply place the officers at the scene of the altercation and assert a group liability theory. Cf. Jones v. Williams, 297 F.3d 930, 936 (9th Cir.2002) (concluding that evidence and admissions that officers were among those inside a house was not enough to support a group liability jury instruction in an unreasonable search case). Instead, he has properly relied on the deputies' own admissions that they were involved in the altercation and that they exerted some physical force on him to create the necessary inference that the deputies were "integral participants in the alleged unlawful act." See id. at 936.
 
 
 21
 Specifically, Deputy Walker admits to pulling Lolli out of the cell, falling to the ground with Lolli, putting his knee on Lolli's back and trying to control his hand, striking Lolli twice in the lower back and cuffing him. Deputy Kent admits falling to the ground with Lolli and grabbing Lolli's legs. Deputy Baum admits that after he observed several deputies struggling with Lolli, he grabbed one of Lolli's arms or legs. Deputy Richards admits he used a wrist lock to gain control of one of Lolli's arms, sprayed Lolli with pepper spray and carried him to the medical observation cell. Deputy Finlay admits that he put his hands on Lolli's lower back and applied pressure, hit Lolli three times in the lower back in response to Lolli's allegedly swinging his cuffed arm around, carried Lolli to the observation cell and bent Lolli's knees and forced his lower back to the ground in that cell. Certainly, if Lolli had been able to view the individual deputies more clearly during the beating the inferences a jury could draw would be stronger. Cf. Rutherford v. City of Berkeley, 780 F.2d 1444, 1448 (9th Cir.1986) (reversing directed verdict for three officers where they admitted that they participated in the detaining, arrest and handcuffing of the plaintiff, and the plaintiff testified that he saw their faces during the beating). But he has presented enough to avoid summary judgment; at this stage, the case will not turn on the happenstance of whether Lolli was held face up or face down on the ground.
 
 
 22
 Neither of the two supervising sergeants — Sergeants Toledo and Meyer — was physically involved in the altercation, although both observed at least part of it, and one ordered that pepper spray be used. A supervisor may be held liable under § 1983 "if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." Jackson, 268 F.3d at 653. Sergeant Toledo's order to use the pepper spray against an allegedly compliant Lolli is sufficient involvement in the alleged unconstitutional violation such that summary judgment in his favor was inappropriate. Sergeant Meyer's case is somewhat different: the misconduct that Lolli alleges is Meyer's failure to intervene in the assault. Sergeant Meyer admitted that he observed the deputies struggling with Lolli, but he did not become involved or give orders. He testified that he and Sergeant Toledo were the supervisors present, but that Toledo was in charge because he was "responsible for activities on the floor...." Despite the presence of Sergeant Toledo, the evidence of Sergeant Meyer's failure to bring his subordinates under control could support liability under § 1983, and he is therefore not entitled to summary judgment. See Cunningham v. Gates, 229 F.3d 1271, 1292 (9th Cir.2000) (concluding that supervisors may be held liable for "their acquiescence in the constitutional deprivation of which a complaint is made").
 
 
 23
 In contrast, the grant of summary judgment to Sheriff Carona and Assistant Sheriff Hewitt was proper. Lolli has not presented evidence from which a jury could conclude that these defendants should be held liable for the alleged use of excessive force against Lolli; he has not demonstrated that they were present at the jail that night, much less that they had any involvement in the incidents that unfolded or were linked to any policy — or lack thereof — that encouraged or allowed such conduct. See id. Indeed, Lolli concedes that Sheriff Carona and Assistant Sheriff Hewitt were not present at the scene and that any liability for failing to intervene in the beating would not attach to them. In sum, we affirm the grant of summary judgment on Lolli's excessive force claim as to Sheriff Carona and Assistant Sheriff Hewitt, but reverse it as to Sergeants Toledo and Meyer and Deputies Walker, Finlay, Baum, Richards and Kent.
 
 D. The Medical Needs Claim
 
 24
 Although the Fourth Amendment provides the proper framework for Lolli's excessive force claim, see Pierce, 76 F.3d at 1043, it does not govern his medical needs claim. Claims of failure to provide care for serious medical needs, when brought by a detainee such as Lolli who has been neither charged nor convicted of a crime, are analyzed under the substantive due process clause of the Fourteenth Amendment. See Gibson, 290 F.3d at 1187. In order to defeat summary judgment, under traditional Eighth Amendment standards used in Fourteenth Amendment claims such as this one, Lolli must show that he was (1) "confined under conditions posing a risk of `objectively, sufficiently serious' harm" and (2) "that the officials had a `sufficiently culpable state of mind' in denying the proper medical care." Clement v. Gomez, 298 F.3d 898, 904 (9th Cir.2002).[6] "A defendant is liable for denying needed medical care only if he `knows of and disregards an excessive risk to inmate health and safety.'" Gibson, 290 F.3d at 1187. "In order to know of the risk, it is not enough that the person merely `be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, [] he must also draw that inference.' ... But if a person is aware of a substantial risk of serious harm, a person may be liable for neglecting a prisoner's serious medical needs on the basis of either his action or his inaction." Id. at 1188 (alteration in original). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir.2002) (internal quotation marks omitted).
 
 
 25
 Lolli has presented evidence that he is an insulin-dependent Type I diabetic and has been so for over 25 years. Diabetes is a common yet serious illness that can produce harmful consequences if left untreated for even a relatively short period of time. See DIABETES IN AMERICA 5 (Maureen I. Harris et al. eds., 2d ed.1995) (noting 10%-50% mortality rate for certain acute metabolic complications from diabetes), available at http://www.diabetes.niddk.nih.gov (last visited Nov. 13, 2003); see also Barnes v. Indep. Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan, 64 F.3d 1389, 1395 n. 2 (9th Cir.1995) ("Well-known medical facts are the types of matters of which judicial notice may be taken.") (internal quotation marks omitted). It constitutes a serious medical need. See Clement, 298 F.3d at 904 ("a serious medical need is present whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain") (internal quotation marks omitted).[7] Lolli's testimony reflects that a person with Type I diabetes who is unable to take insulin or eat regularly, as Lolli was on the night in question, will suffer from a combination of symptoms including "nausea, muscle cramping, insatiable thirst, increased urination, elevated heart rate, `trembly kind of feeling,' an uncontrollable shaking, elevated blood pressure, panic[,] feeling irritab[le], headaches, inability to concentrate, disorientation, sweats, visible pallor, and, if not treated with insulin or food, dementia." Leaving a diabetic such as Lolli without proper food or insulin when it is needed creates an "objectively, sufficiently serious" risk of harm. Id. Indeed, Lolli testified that during the course of his time at the jail — without his medication or food — he was "feeling weak and was experiencing blurred vision," became "panicked" and "scared" and was "experiencing nausea and increased urination," which he associated with the beginnings of a ketoacidic condition.
 
 
 26
 We therefore join our sister circuits in acknowledging that a constitutional violation may take place when the government does not respond to the legitimate medical needs of a detainee whom it has reason to believe is diabetic. See Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir.2003); Egebergh v. Nicholson, 272 F.3d 925, 927-28 (7th Cir.2001); Hunt v. Uphoff, 199 F.3d 1220, 1223-24 (10th Cir.1999); Roberson v. Bradshaw, 198 F.3d 645, 648 (8th Cir.1999); Weyant v. Okst, 101 F.3d 845, 857 (2d Cir.1996); Slay v. Alabama, 636 F.2d 1045, 1046 (5th Cir. Unit B Feb.1981). The question, then, is whether Lolli presented evidence from which a reasonable jury could conclude that any of the individual officers knew of and were deliberately indifferent to this substantial risk of serious harm Lolli faced if not properly treated. We conclude that he did.
 
 
 27
 The record supports the inference that the officers who either were near Lolli in the holding cell or were present when Lolli was carried to the medical observation cell were on notice of Lolli's diabetic condition and his need for food. Lolli testified that when Deputy Walker entered the holding cell at around midnight, Lolli told Walker that he was diabetic, was feeling very sick, had been promised food that was long overdue and asked Walker to find out what happened to his snack. He also testified that "other deputies" were standing near Walker when he spoke; the record reveals that of the named defendants, Deputy Kent was near Deputy Walker at the time Lolli allegedly made this statement. Lolli also testified that while deputies were carrying him to the medical observation cell, he told them that he was a diabetic and all he needed was some food. The record shows that Sergeant Toledo and Deputies Walker, Richards, Finlay and Baum carried or accompanied those who carried Lolli to the medical observation cell. In sum, the evidence Lolli has presented — although controverted by the deputies' denials that Lolli told them that he suffers from diabetes and required food — could establish that Deputies Walker, Kent, Finlay, Richards and Baum and Sergeant Toledo knew that Lolli was diabetic and needed food.
 
 
 28
 To have acted with deliberate indifference, however, the officers also must have inferred from this information that Lolli was at serious risk of harm if he did not receive the food. See Gibson, 290 F.3d at 1188. There is no direct evidence that any of these named defendants knew of this risk of harm. Cf. Egebergh, 272 F.3d at 927-28 (concluding that because one officer "knew that an insulin-dependent diabetic needs regular insulin injections" and the other officer knew "that diabetes is potentially fatal," the plaintiff could avoid summary judgment on her deliberate in-deliberate difference claim). However, the officers' indifference to Lolli's extreme behavior, his obviously sickly appearance and his explicit statements that he needed food because he was a diabetic could easily lead a jury to find that the officers consciously disregarded a serious risk to Lolli's health. Much like recklessness in criminal law, deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm. See Farmer v. Brennan, 511 U.S. 825, 842, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence,... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); Gibson, 290 F.3d at 1197 (acknowledging that a plaintiff may demonstrate that officers "must have known" of a risk of harm by showing the obvious and extreme nature of a detainee's behavior).
 
 
 29
 According to Lolli's testimony, his blood sugar level was seriously off balance when he encountered the deputies because he had taken insulin prior to his arrest but had been given no food. From this, a jury could infer that Lolli exhibited noticeable shaking, disorientation, sweating and pallor — symptoms that Lolli testified were associated with his not receiving necessary food. He also testified that he was on his feet and spoke up to the deputies as soon as they entered the cell, telling them of his deteriorating condition and asking for food, and even after he had been cuffed and was being carried away he continued to do so, pleading "My God, ... I'm a diabetic, and all I needed was food, all I need is some food." The urgency of his protestations about his diabetes and need for food — protestations he persisted in making even after they allegedly brought on a serious beating — further supports the inference that the officers knew of the risk of harm Lolli faced. A jury, therefore, could reasonably infer that the officers who knew of Lolli's diabetic condition and need for food also knew of the risk of harm that he faced if denied medical attention. In light of the disputed issues of fact, we reverse the grant of summary judgment on Lolli's medical needs claim as to Sergeant Toledo and Deputies Walker, Finlay, Baum, Richards and Kent. Because Lolli failed to introduce sufficient evidence that Sheriff Carona, Assistant Sheriff Hewitt and Sergeant Meyer knew of Lolli's diabetic condition, we affirm the grant of summary judgment on Lolli's medical needs claim in their favor.
 
 E. Qualified Immunity
 
 30
 Because of the factual disputes that Lolli has identified, the individual officers whose grants of summary judgment we have reversed also are not entitled to summary judgment based upon qualified immunity. See Santos v. Gates, 287 F.3d 846, 855 n. 12 (9th Cir.2002) (declining to grant qualified immunity "because whether the officers may be said to have made a `reasonable mistake' of fact or law, may depend upon the jury's resolution of disputed facts and the inferences it draws therefrom" (citation omitted)); see also Martinez v. Stanford, 323 F.3d 1178, 1184-85 (9th Cir.2003) (the "facts in dispute bearing on the question of qualified immunity" made summary judgment on that ground inappropriate). If Lolli's version of the facts ultimately prevails, there is a reasonable likelihood that the officers would not be entitled to qualified immunity. See Felix v. McCarthy, 939 F.2d 699, 701-02 (9th Cir.1991) (by 1985, the law of this circuit would have put reasonable officers on notice that an "unprovoked and unjustified attack by a prison guard" violated clearly established constitutional rights); Clement v. Gomez, 298 F.3d 898, 906 (9th Cir.2002) (by 1995 it was "clearly established that the officers could not intentionally deny or delay access to medical care").
 
 F. State Law Claims
 
 31
 Finally, because the district court dismissed Lolli's state law claims — negligence, intentional and negligent infliction of emotional distress, torts in essence, and assault and battery — for lack of supplemental jurisdiction, we reverse that ruling as well. Given that Lolli's federal constitutional claims against some of the individual officers survive summary judgment, the district court has jurisdiction to consider the state law claims. See 28 U.S.C. § 1367.
 
 
 32
 AFFIRMED in PART, REVERSED in PART and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 A surveillance tape of the incidents — containing a mute series of essentially still images from a number of angles — reveals little detail of what happened that night. Lolli is obscured from view for most of the time and the tape does not clearly show Lolli resisting or whatever force the officers may have applied to him. As a result, it does little to assist in our review of the case at this procedural postureCf. Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121, 1132 n. 5 (9th Cir.2000), vacated by County of Humboldt v. Headwaters Forest Def., 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001). ("The videotape evidence here appears to raise more questions than it answers, which in the context of a motion for judgment as a matter of law must be resolved in favor of the plaintiffs as the nonmoving parties."). "[T]he reasoning of a vacated opinion may be looked to as persuasive authority if its reasoning is unaffected by the decision to vacate". United States v. Barona, 56 F.3d 1087, 1093 n. 1 (9th Cir.1995).
 
 
 [2]
 Pursuant to a stipulation of the parties, and before it ruled on the motion for summary judgment, the district court ordered the matter dismissed with prejudice as to Deputy Breaton. Because that dismissal was a "final judgment on the merits,"see Stewart v. U.S. Bancorp, 297 F.3d 953, 956 (9th Cir.2002), and the district court therefore lacked the power to grant summary judgment in his favor, see Seidman v. City of Beverly Hills, 785 F.2d 1447, 1448 (9th Cir.1986), we vacate the grant of summary judgment as to Deputy Breaton.
 
 
 [3]
 The officers argue that if we treat the notice of appeal as encompassing the grant of summary judgment, we should nonetheless dismiss it as untimely because Lolli's bad faith in bringing the motion for reconsideration forecloses the equitable tolling of the 30-day period for appealing the summary judgment order. We disagree. Even if we were to read a "good faith" requirement into Federal Rule of Appellate Procedure 4 and then interpret good faith as "meritorious," as the officers suggest —but see Feldman v. Allstate Ins. Co., 322 F.3d 660, 665-66 (9th Cir.2003) (observing that "[t]he Ninth Circuit has previously refused to read a validity requirement into [FRAP 4(a)(4)]" and holding that the court had jurisdiction over an appeal despite technical noncompliance with local rules) — Lolli did not exhibit bad faith in bringing his motion.
 
 
 [4]
 Graham directs us to pay careful attention to the facts of the particular case, including "`the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight,'" although "[i]n the context of pretrial detention rather than arrest, it is clear that all the factors mentioned in Graham ... will not necessarily be relevant." Gibson, 290 F.3d at 1197 & n. 21 (quoting Graham, 490 U.S. at 396, 109 S.Ct. 1865).
 
 
 [5]
 Headwater's excessive force holding remains good law, notwithstanding that the opinion was vacated and the case remanded. See Santos, 287 F.3d at 855 n. 11.
 
 
 [6]
 Lolli has not argued for a more demanding standard of care and we therefore do not pursue the issueSee Marsh v. Butler County, 268 F.3d 1014, 1024 n. 5 (11th Cir.2001) (declining to decide how the Eighth and Fourteenth Amendment standards for evaluating medical needs claims differ given the lack of argument); see also Gibson, 290 F.3d at 1189 n. 9 ("It is quite possible ... that the protections provided pretrial detainees by the Fourteenth Amendment in some instances exceed those provided convicted prisoners by the Eighth Amendment."); cf. Oregon Advocacy Center v. Mink, 322 F.3d 1101, 1121 (9th Cir.2003) (holding that "the substantive due process rights of incapacitated criminal defendants are not governed solely by the deliberate indifference standard"); Jensen v. Lane County, 312 F.3d 1145, 1147 (9th Cir.2002) (concluding that to comport with due process, committing physicians must exercise judgment "on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community").
 
 
 [7]
 Before the district court, the officers denied that Lolli told them that he was a diabetic or needed food. They have not argued, however, that they would have failed to appreciate the risk of harm he faced had they known of Lolli's medical condition, and this is hardly surprising given the familiarity and prevalence of the diseaseSee, e.g., Nat'l Inst. of Diabetes & Digestive & Kidney Diseases, Nat'l Diabetes Stat. (2003), at http://diabetes.niddk.nih.gov (last visited Nov. 13, 2003) (18.2 million people in the United States have diabetes).
 
 
 
 33
 O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part.
 
 
 34
 I concur in Parts A, B, C, and F of the court's opinion, but I must respectfully dissent from the majority's conclusion in Parts D and E. I would affirm the district court's grant of summary judgment in favor of Sergeant Toledo and Deputies Walker, Finlay, Baum, Richards, and Kent on Lolli's medical needs claim.
 
 
 35
 To establish that officials were indifferent to his medical needs, Lolli was required to show that "the official ... both [was] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he ... also [drew] the inference." Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); see also Gibson v. County of Washoe, 290 F.3d 1175, 1196-97 (9th Cir.2002). In this case, viewing the facts in the light most favorable to Lolli, all that can be said is that some deputies knew he was diabetic. He has made no showing that any of the deputies knew of the risk to him if he did not receive food — or, to put it in the language of the controlling legal standard, that deputies actually drew the inference that Lolli was at a substantial risk of serious harm.
 
 
 36
 The majority relies on the claim that diabetic symptoms are sufficiently well-understood, and Lolli's symptoms were so obvious, that deputies "must have known" of the risk to Lolli if his illness went untreated. But the Supreme Court in Farmer explicitly refused to adopt a standard that would impose liability for risks so obvious that officers could be charged with knowledge as a matter of law. See Farmer, 511 U.S. at 836-37, 841-42, 114 S.Ct. 1970 ("[W]e cannot accept petitioner's argument that ... a prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it."). The Court instead adopted a subjective test for deliberate indifference that required actual knowledge of the risk of harm if an inmate's health or safety needs were ignored. See id. at 829, 114 S.Ct. 1970 ("This case requires us to define the term `deliberate indifference,' as we do by requiring a showing that the official was subjectively aware of the risk.") and 840 ("[L]iability requires consciousness of a risk[.]"). The Court analogized the standard for liability to the state of mind "consistent with recklessness in the criminal law" — that is, conscious disregard of a risk of harm. Id. at 837, 839-40, 114 S.Ct. 1970; see also Gibson, 290 F.3d at 1188 ("If a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk."). Farmer thus clearly imposes a subjective test requiring actual knowledge of a substantial risk of serious harm.
 
 
 37
 The majority also points to decisions of our sister circuits upholding deliberate indifference claims by diabetics. But at least two of these cases involved clear evidence that officials actually knew of the substantial risk of serious harm presented by the detainee's condition. In Weyant v. Okst, 101 F.3d 845 (2d Cir.1996), for example, there was evidence that both officers knew that the detainee required immediate medical attention; indeed, one officer suggested that the detainee be taken to the hospital. Id. at 857. In Egebergh v. Nicholson, 272 F.3d 925 (7th Cir.2001), it was shown that both defendant officers knew that diabetics could be harmed if deprived of insulin shots. Id. at 928. In both cases, then, officials demonstrated the subjective awareness of the risk of harm required by Farmer.
 
 
 38
 Because Lolli has not shown that any officer actually drew the inference that a substantial risk of harm existed, I would affirm the district court's grant of summary judgment in favor of Sergeant Toledo and Deputies Walker, Finlay, Baum, Richards, and Kent.
 
 
 39
 As to Part E, because I believe that the defendants were entitled to summary judgment on Lolli's medical needs claim, a qualified immunity inquiry on that issue is unwarranted. See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").