**Mary COTTON, in her capacity as Successor in Interest for Decedent Russell Dene Cotton; et al., Plaintiffs—Appellants,**

v.

**COUNTY OF SANTA BARBARA, a public entity; et al., Defendants—Appellees.**

No. 06–56079.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 2008.

Filed July 22, 2008.

Tallman, Circuit Judge, filed a dissention opinion.

Heleni E. Suydam, Sands & Associates, Beverly Hills, CA, for Plaintiffs–Appellants.

Jake Stoddard, Santa Barbara County Counsel's Office, Santa Barbara, CA, for Defendants–Appellees.

Before: SCHROEDER, WARDLAW, and TALLMAN, Circuit Judges.

## MEMORANDUM *

Russell Cotton's wife and children ("Appellants") appeal the district court's grant of summary judgment in favor of the County of Santa Barbara and other named defendants ("Appellees") in their § 1983 lawsuit arising from Cotton's death while in the custody of the Santa Barbara Sheriff's Department ("SBSD"). The district court concluded that Appellants failed to raise any triable issue of fact as to (1) whether Cotton was unlawfully arrested, (2) whether SBSD officers used unreasonable force against Cotton, and (3) whether SBSD officers violated Cotton's constitutional right to receive adequate medical treatment. We have jurisdiction pursuant

\* This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

to 28 U.S.C. § 1291, and although we find that Cotton's arrest was lawful, we conclude that genuine issues of material fact precluding summary judgment exist as to the claims of excessive force and inadequate medical treatment.

■ The officers did not violate the Fourth Amendment when they arrested Cotton. Probable cause to believe that Cotton violated the law existed when he kicked out the MHAT vehicle's window in their presence. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Appellants' claim that the arrest violated California Welfare & Institutions Codes §§ 5150 and 5150.1 is misplaced because, even if it were held by the state courts that such an arrest violated state law, that would not give rise to a Fourth Amendment violation.

■ A reasonable jury could find that Officer Martinez used excessive force against Cotton in violation of the Fourth Amendment. *See Lolli v. County of Orange*, 351 F.3d 410, 415 (9th Cir.2003) (" 'The Fourth Amendment sets the applicable constitutional limitations for considering claims of excessive force during pre-trial detention.' ") (quoting *Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir.2002)). Viewing the evidence in the light most favorable to Appellants, as we must on summary judgment, Officer Martinez pushed Cotton hard into a jailhouse wall, after Cotton said "no" to the officers transporting him across the jail and turned back in the direction from which they had come. Officer Martinez knew that the handcuffed, sixty-two-year-old Cotton suffered from severe mental illness and respiratory difficulty. Under the circumstances, balancing the amount of force used against the lack of provocation, a reasonable jury could find that Officer Martinez's use of force was excessive. *See Lolli*, 351 F.3d at 415 ("In considering an excessive force claim, we balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." (internal quotation marks omitted)); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003) ("[T]he degree of force used by the police is permissible only when a strong government interest *compels* the employment of such force." (internal alteration and quotation marks omitted) (emphasis in original)).[1]

■ The district court also erred in finding no genuine issues of material fact

---

1. The dissent seems to make the unsupported suggestion that the government is entitled to use *more* force in a custodial setting than in a public arrest. As the dissent points out, the Supreme Court has recognized that prison administrators have a responsibility to ensure the *safety of prison staff, personnel, visitors,* and the inmates themselves. *See Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986); *but see Graham v. Connor*, 490 U.S. 386, 399 n. 11, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (analyzing excessive force claim under the Fourth Amendment and noting that *Whitley*'s analysis "had no implications beyond the Eighth Amendment con-

text."). But, of course, the government has a similar responsibility to protect the public and arresting officers. *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Moreover, the government has far more control in a custodial context, and can therefore more easily prevent situations where the use of force would become necessary. Because "it is the *need* for force which is at the heart of the" excessive force analysis, *Drummond*, 343 F.3d at 1057 (internal quotation omitted), the fact that the force used against Cotton occurred while he was in custody must, if anything, cut against the Appellees.

as to Appellants' claim that Cotton was deprived of his constitutional right to adequate medical treatment. *See Lolli*, 351 F.3d at 418–19 ("Claims of failure to provide care for serious medical needs, when brought by a detainee ... who has been neither charged nor convicted of a crime, are analyzed under the substantive due process clause of the Fourteenth Amendment."). First, the arrest report states that the Psychiatric Health Facility ("PHF") "repeatedly denied the [officers'] request" to admit Cotton, despite their "agree[ment] that the best place for Cotton would be a mental health facility." Especially in light of California Welfare and Institutions Code § 5150.1, which requires that a "peace officer be [allowed] to transport [a] person [on a psychiatric hold] directly to [a] designated facility," a reasonable jury could find that PHF and its employees acted with deliberate indifference to Cotton's medical needs in denying him access to the facility. *See Lolli*, 351 F.3d at 419. Second, the officers left Cotton alone in the safety cell without checking his vital signs, after he had been "yelling repeatedly 'I can't breath[e], don't touch me. I can't fucking breath[e], let me go,'" and after he had been held on his stomach in a four-quarter restraint, during which time he had stopped struggling and began mumbling unintelligibly. As the officers left, Cotton was still "hollering, 'I can't breathe,' ... [a]mong other things." A reasonable jury could find that the officers acted with deliberate indifference to Cotton's medical needs by leaving him alone in the safety cell in the face of compelling evidence of medical distress.[2]

The dissent's reliance on *Gregory v. County of Maui*, 523 F.3d 1103 (9th Cir. 2008), to conclude that the force used by police was objectively reasonable and the medical treatment adequate, is misplaced. In *Gregory*, the plaintiff-decedent was resisting arrest, threatening the officers, and suffering from a heart infirmity unknown to the officers who were trying to restrain him. *Id.* at 1104–05. Here, the victim was in police custody; the officers knew he was mentally ill and suffered from respiratory problems, yet they used abrupt and substantial force to subdue him and then walked away, leaving him in an obviously physically distressed condition.

We therefore affirm the district court's grant of summary judgment on Appellants' unlawful arrest claim. We reverse the grant of summary judgment as to Appellants' excessive force claim against Officer Martinez, who pushed Cotton against the wall. Finally, we reverse the grant of summary judgment as to Appellants' claims of deliberate indifference to Cotton's medical needs against PHF and its employees who denied Cotton access to the facility, and the officers who left Cotton unattended without checking his vital signs. We remand for further proceedings consistent with this disposition.

**AFFIRMED in part, REVERSED in part, and REMANDED.** Each party shall bear its own costs on appeal.

**2.** The dissent's assertion that "Cotton was kicking and screaming the entire time the officers were attempting to control him" is belied by the record. Officer Coburn testified that Cotton "became compliant" and "stopped fighting" "shortly after [being] rolled ... onto his stomach." Officer Coburn explained that Cotton was moving only his head, "was still challenging, but he wasn't fighting," and was "mumbling ... statements, unintelligible." Officer Turner testified that Cotton was still complaining that he could not breath, even as the officers were leaving the cell. Given that Cotton had become compliant by this point, the dissent offers no explanation why the officers would need to "evacuat[e] the cell for their own physical safety" before checking Cotton's vital signs. Viewing the evidence in the light most favorable to Appellants, as we must, a reasonable jury could find that the officers ignored compelling evidence of Cotton's medical distress.

TALLMAN, Circuit Judge, dissenting:

I respectfully dissent. Reversing us in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court reminded us of a lesson we today ignore, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 209, 121 S.Ct. 2151 (internal quotation marks omitted). This is especially so when moving an unruly, mentally ill, pretrial detainee within a county jail who decides not to comply with jailers escorting him to a housing unit.

"The Due Process clause protects pretrial detainees from the use of excessive force that amounts to punishment." *Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir.2002) (citing *Graham v. Connor*, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "[W]e have determined that the Fourth Amendment sets the applicable constitutional limitations for considering claims of excessive force during pretrial detention." *Id.* (internal quotation marks omitted). Under *Graham* the pertinent question is whether the force used "was objectively reasonable 'in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.'" *Gregory v. County of Maui*, 523 F.3d 1103, 1106 (9th Cir.2008) (alteration in original) (quoting *Graham*, 490 U.S. at 397, 109 S.Ct. 1865). Determining the "reasonableness" of a particular action "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotation marks omitted).

When assessing the reasonableness of an officer's actions during an arrest, *Graham* directs us to consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396, 109 S.Ct. 1865. We have recognized that not all of the *Graham* factors are relevant when the alleged excessive force occurs during an altercation with a pretrial detainee. *See Gibson*, 290 F.3d at 1197 & n. 21; *see also Lolli v. County of Orange*, 351 F.3d 410, 415–16 & n. 4 (9th Cir.2003). It is also clear that the *Graham* factors do not adequately take into consideration the governmental interests at stake when resistance occurs in a custodial setting. The Supreme Court has recognized that "prison administrators are charged with the responsibility of ensuring the safety of the prison staff, administrative personnel, and visitors, as well as the 'obligation to take reasonable measures to guarantee the safety of the inmates themselves.'" *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).[1]

---

**1.** The majority's citation to *Graham*, 490 U.S. at 399 n. 11, 109 S.Ct. 1865, in an attempt to argue that officers in this case had a duty to use less force simply because Cotton was in custody is misleading. First, I cite to *Whitley* for the unremarkable proposition that the custodial setting raises considerations not accounted for by the *Graham* factors. Nothing in *Graham* undermines that statement. In the footnote cited by the majority, the Supreme Court explained why its endorsement of Judge Friendly's partially subjective test in *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.1973), was limited to the Eighth Amendment context and did not extend to an excessive force analysis under the Fourth Amendment. Our court's holding that the Fourth Amendment sets the applicable standards for an excessive force claim raised by a pretrial detainee, *see Gibson*, 290 F.3d at 1197, does not mandate that we turn a blind eye to the volatile conditions inherent in custodial settings, particularly when dealing with a mentally ill, violent offender who refused to comply with lawful directives of the jailers. The importance of

Viewing the evidence in a light most favorable to Appellants, Officer Martinez used reasonable unarmed force to restrain Cotton, a mentally ill, agitated and combative pretrial detainee who posed a threat to himself, the officers, and other administrative personnel. Cotton presented as a frequent arrestee well known to the jail staff because of his arrests in the weeks prior to this incident. Medical personnel at the Santa Barbara County Jail evaluated Cotton after he arrived on this arrest. A nurse described him as uncooperative, with compulsive behavior and possible dementia on the date in question. He later refused to talk to a mental health worker. Shortly thereafter, Dr. Babus, a staff psychiatrist, evaluated Cotton. Dr. Babus took notice of Cotton's belligerent behavior and paranoid references, and he concluded Cotton was "dangerous." In the doctor's judgment, safely transporting Cotton to an in-patient psychiatric hospital could not be accomplished until the next day when adequate help was available to move him in restraints.

After his interview with Dr. Babus, Cotton was moved to a dress-in room in the Inmate Reception Area to change into jail clothing. There, Cotton threatened to kill Officer Martinez. According to Officer Martinez's testimony, Cotton "was angry and did not appear to want to be moved." Cotton threatened Officer Martinez by stating that he was going to rip his throat out and that he was going to kill him. This was consistent with Cotton's earlier threats that day to harm Cotton's wife, which had resulted in her call for help and his arrest.

To move Cotton to the Northwest cell block section of the Main Jail for housing, Officer Martinez cuffed Cotton's hands in front of his body to allow Cotton to carry his property as they walked. After passing the primary receiving desk, Cotton unexpectedly yelled "NO!" and "suddenly turned." Officer Martinez declared that he "became concerned because the Sallyport and booking areas [—where new arrestees arrive and are processed—we]re located" in close proximity. He "was also concerned that Mr. Cotton in his agitated state would be a danger to other persons [or himself] if not controlled." Officer Martinez stated that "[i]t is dangerous to allow any inmate to be uncontrolled" in the Inmate Receiving Area.

Even inferring from the record that Officer Martinez pushed Cotton "hard" into the wall, Officer Martinez's actions were reasonable in light of the circumstances. We cannot forget that " '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' " *Gibson*, 290 F.3d at 1197–98 (alteration in original) (quoting *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865). Officer Martinez was not only concerned for his personal safety, but he was concerned for the safety of Cotton, other inmates, as well as the jail personnel in the booking area. The deputy employed only his hands to try to control the unruly Cotton. There is no forensic evidence linking the force used in the hallway when Cotton was pushed into the wall by Officer Martinez with the respiratory problem that plaintiff says caused Cotton difficulty breathing when left on his side on the floor of the safety cell.

We have held that mental illness "is a factor that must be considered in determining, under *Graham*, the reasonableness

maintaining institutional security should be a significant factor we consider in determining

whether the officer's actions were objectively reasonable.

of the force employed." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir.2003) (internal quotation marks omitted). But, even recognizing that Cotton displayed symptoms of obvious mental illness, Officer Martinez's response to the threat Cotton posed when he resisted the movement to his cell—attempting to restrain Cotton by pushing him into the wall hard—was objectively reasonable. *See Gregory*, 523 F.3d at 1107–08 (noting that "even [if] the officers' accounts of the confrontation [were] incredible, there is no medical or circumstantial evidence that could support the conclusion that the use of force by the officers was excessive"). I would therefore affirm the district court's grant of summary judgment in favor of all Appellees on Appellants' claim of excessive force. The amount of force used was reasonable as a matter of law where the jailer had no other choice. The majority does not offer any alternative to the force actually employed by the jailers trying to control a belligerent Cotton.

The district court also properly granted Appellees' summary judgment on Cotton's claim that he was deprived of his constitutional right to adequate medical treatment. I agree with the majority that the officers did not violate Cotton's Fourth Amendment rights when they arrested him for vandalizing a Mental Health Assessment Team vehicle after he kicked out a window in the caged area. Appellants have offered no precedent holding that a pretrial detainee lawfully under arrest, but also on a psychiatric hold under California Welfare and Institutions Code section 5150 (authorizing arrest for evaluation where the person poses a danger to himself or others), has a constitutional right to be transferred immediately to a psychiatric facility. The issue, therefore, is not whether staff at the Santa Barbara Psychiatric Health Facility violated Cotton's substantive due process rights by failing to admit him immediately because they had only two female nurses on duty who may well have had trouble controlling a violent patient, but whether Cotton received adequate medical attention prior to his death. He did.

Upon first arriving at the County Jail, Cotton was evaluated by a nurse and a mental health worker. He was then evaluated by Dr. Babus, a psychiatrist. Dr. Babus stated that Cotton "looked quite angry," "physically strong," and "somewhat intimidating." Dr. Babus decided to transfer Cotton to the separate Psychiatric Health Facility the following day. He stated that it was his practice to wait until the following morning "to get the staff and facility ready." Dr. Babus "anticipated Mr. Cotton could require being placed on a gurney with five-point restraints to effect his transfer." The doctor concluded this would require several sheriff's deputies if Mr. Cotton was to be safely moved. He saw "nothing ... in [his] assessment of Cotton indicat[ing] that he would be worse off in any way if [they] waited to transfer him the following morning." Neither the Appellants nor the majority offer any evidence to suggest that the medical attention Cotton received at the Santa Barbara County Jail was in any way inadequate. *See Gregory*, 523 F.3d at 1107–08.

The majority nonetheless concludes that a reasonable jury could find that the officers acted with deliberate indifference by leaving Cotton alone, unrestrained while lying on his side, and obviously breathing on his own in the safety cell, in what my colleagues term compelling evidence of medical distress. The majority fails to acknowledge, however, the undisputed evidence that Cotton was kicking and screaming the entire time the officers were at-

tempting to control him.[2] *See id.* at 1105 (noting that, despite Appellant's claims to the contrary, he "was breathing during the struggle since he was able to talk"). Although he did tell the officers that he could not breathe, the officers had a right to take precautions to protect themselves from injury by first evacuating the cell for their own physical safety. Within a minute of leaving the safety cell one of the officers noticed the respiratory problem. The officers then took immediate action to summon medical assistance available within the jail and an ambulance was called.

The jail nurse arrived quickly and applied an oxygen mask, and the officers began administering CPR after the nurse determined that oxygen was not having any positive effect. Because there are no genuine issues of material fact, and because the officers fulfilled their obligations to Cotton by promptly summoning medical help and by starting CPR when the nurse directed deputies to do so, *see Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th Cir.1986) ("Due process requires that police officers seek the necessary medical attention for a detainee when he or she has been injured while being apprehended by either promptly summoning the necessary medical help or by taking the injured detainee to a hospital."), I would affirm the district court's grant of summary judgment in favor of Appellees on the medical indifference claim.

Because the majority fails to faithfully apply Supreme Court precedent, I respectfully dissent.

---

2. Officer Martinez testified that after he attempted to control Cotton a "struggle ensued." "During this time Mr. Cotton [w]as yelling and screaming and struggling aggressively." Other officers had to come to Officer Martinez's aid as he "ended up on the floor partially below Cotton." Even after the other officers freed Officer Martinez and the officers picked Cotton up to carry him to the safety cell, "Cotton was still struggling and kicking." Once placed on the floor of the safety cell Cotton continued to struggle, attempting to grab Officer Coburn's groin. Only after the officers had secured Cotton in

the safety cell did Cotton "become compliant" as the majority describes. Given his combative behavior all the way to his cell, I am at a loss to understand why the majority thinks it was unreasonable for officers to briefly depart the cell for their own safety once Cotton was finally placed inside it. Giving an unruly inmate time to calm down is a reasonable tactic under the circumstances.

